FIREMAN'S FUND INSURANCE COMPANY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. KC–3376.

United States District Court,
D. Kansas.

June 7, 1973.

Robert H. Foerschler, of McAnany, Van Cleave & Phillips, Kansas City, Kan., James C. Mordy, of Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, Mo., for plaintiff.

Robert J. Roth, U. S. Atty., James A. Pusateri, Asst. U. S. Atty., Kansas City, Kan., for defendant.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This is an action between a Miller Act payment bond surety and the United States. Plaintiff, Fireman's Fund, alleges that the United States wrongfully

paid the contractor (Scheven), when it was under a duty to refrain from making such payments. Plaintiff has paid certain of Scheven's suppliers and now seeks recovery for these payments to the extent of the Government's alleged improper remittances to Scheven.

There is no question that this court has jurisdiction of the parties and subject matter of the action.

Three construction projects are involved and each will be considered separately.

I. McCONNELL AIR FORCE BASE. The dispute arising out of the McConnell Air Force contract has to do with two progress payments made by the government to Scheven in the amount of $2,292.57 and $4,344.44. Plaintiff claims that it is subrogated to the first $3,928.25 of the combined amount of these payments. As is true with all three projects, there is no factual dispute. The following facts are stipulated:

1. On or about July 23, 1969, defendant, acting by and through the Procurement Division of McConnell Air Force Base, Kansas, entered into Contract No. F 14614–69–C–0236 with Fredrick Scheven, for the performance of certain work at or near said McConnell Air Force Base.

2. As required by the provisions of the Miller Act, 40 U.S.C. § 270a, Scheven, on or about July 8, 1969, secured a payment bond with himself as principal and defendant as obligee. Plaintiff is the surety on said bond, its number being SC–6164530.

3. By letter dated December 18, 1969, Mr. Gary Norton, attorney for the Swiff-Train Company, a supplier of Scheven, notified Scheven that his account with the Swiff-Train Company, in the amount of $3,928.25 for materials allegedly furnished by his client on the McConnell contract, was overdue and had been referred to the writer for collection. A copy of this letter was sent to and received by the Contracting Officer at McConnell Air Force Base.

4. On January 14, 1970, defendant delivered to Scheven a progress payment in the amount of $2,292.57.

5. By letter dated January 23, 1970, sent by certified mail to the Contracting Officer at McConnell Air Force Base, plaintiff notified said Officer that it has received notice that certain parties who had allegedly supplied materials for the McConnell project had not been paid by Scheven. Plaintiff requested that all further sums falling due under that contract be forwarded to Scheven, in care of the plaintiff, in order that appropriate application of said monies could be assured.

6. By letter dated January 30, 1970, defendant informed plaintiff that only a bank, trust company, or other financing institution could be a proper assignee of funds due on the McConnell contract.

7. By letter dated February 13, 1970, a copy of which was sent to and received by the Contracting Officer at McConnell Air Force Base, Swiff-Train Company's attorney informed plaintiff that the amount owing from Scheven was as yet unpaid, and that unless it was paid within one week, he would file suit against Scheven and plaintiff.

8. On February 26, 1970, plaintiff telephoned the Service Contracts Branch, Procurement Division, McConnell Air Force Base and, upon learning that the Base Finance Officer was in the process of issuing a progress payment to Scheven in the amount of $4,344.44, requested that said payment be withheld pending receipt of a letter of direction from Scheven.

9. That same date, plaintiff sent a teletype to the Base Finance Officer requesting that she defer forwarding the check pending receipt of a letter of direction from Scheven.

10. On or about March 2, 1970, the letter of direction, not having been received at McConnell Air Force Base, Scheven's invoice was processed for payment. On March 4, 1970, plaintiff sent a teletype to the Base Finance Officer, informing her that plaintiff had been

unable to locate Scheven and presumed that he had sent the letter of direction to her. Once again plaintiff referred to the unpaid claims of suppliers and requested payment to Scheven, in care of plaintiff.

11. On March 5, 1970, plaintiff sent Scheven's letter of direction dated February 25, 1970, to the Finance Officer at McConnell Air Force Base.

12. On March 9, 1970, the defendant forwarded directly to Scheven, a progress payment in the amount of $4,344.44.

13. On or about March 11, 1970, in accordance with its obligation under its payment bond and the Miller Act, plaintiff paid to Swiff-Train Company $3,928.25, the amount owing by Scheven on the McConnell contract.

14. By letter dated November 18, 1970, plaintiff made formal demand upon defendant for the amounts of $2,292.57, and $4,344.44, paid by defendant to Scheven, and the amount of $2,257.89, which plaintiff calculated to be the balance remaining on the contract.

15. By letter dated December 17, 1970, the contracting officer at McConnell Air Force Base notified plaintiff that no part of said demand would be authorized for payment.

Plaintiff contends that the above mentioned correspondence and other communications from Fireman's Fund and Swiff-Train Company to the contracting officer at McConnell Air Force Base constituted demand upon the United States requiring it to refrain from paying the prime contractor, Scheven. Defendant's position is that plaintiff, as late as February 17, 1970, neither was out of pocket nor looked to anyone but Scheven for satisfaction of Swiff-Train's claim, and that a surety gains no entitlement to funds in the hands of the government, either in law or in equity, until the surety has in fact made payment to materialmen and laborers, and then only to the extent of reimbursement. See Pearlman v. Reliance, 371 U.

S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).

In cases of this nature, the government's primary interest is in the timely and efficient completion of the contract work. Plaintiff's argument is that even though the government's failure to make the progress payments might have resulted in a shutdown of the project and a default in the contractor's performance, that the government is still liable for refusing to allow the plaintiff to control the disposition of the progress payments—at least in the amount necessary to fully reimburse the plaintiff for its payment of the contractor's obligations to laborers and materialmen.

Plaintiff places great reliance on Home Indemnity v. United States, 376 F.2d 890, 180 Ct.Cl. 173 (1967); National Surety Corp. v. United States, 319 F.Supp. 45 (N.D.Ala.1970); Fireman's Fund v. United States, 421 F.2d 706, 190 Ct.Cl. 804 (1970); Newark Ins. Co. v. United States, 169 F.Supp. 955, 144 Ct. Cl. 655 (1959); Hanover Ins. Co. v. United States, 279 F.Supp. 851 (S.D.N. Y.1967). These cases are clearly distinguishable and do not support plaintiff's position. Each involved a situation where the government was the stakeholder of a final contract payment due after the completion of performance. In each instance, after due notice of the rights asserted by a payment bond surety, the government abandoned its role as a stakeholder and elected to decide the merits of the conflicting claims. Here, however, the progress payments were made while the contract was still being performed.

In the recent case of United States Fidelity and Guaranty Co., et al. v. United States, Court of Claims, 475 F.2d 1377, 1973, the court was presented with facts similar to those now before this court, and the court in part stated:

"The final issue to be discussed concerns the claim that the progress payment made by the Navy to Premier on December 8, 1965, over the surety's protest was improper and a violation

of the surety's right of subrogation. The plaintiff cites numerous cases in which the payment of a contract sum over a surety's protest has resulted in liability on the part of the Government. There is a critical difference however, which distinguishes those cases from the one presently at issue, and that is the fact that at the time this surety notified the contracting officer that the contractor was not paying his bills, the contract was still in operation with the project not yet complete. In the cases cited by the plaintiff, the work under the contract was complete and the issue centered on who should receive the final payment. In other words the Government in those cases was merely a stakeholder, its interest being satisfied once the project was completed.

The case with which we are now concerned involves the Government's receiving a notice to stop payments to a contractor who was still performing under the contract. The United States in this situation is primarily concerned with completion of performance under the contract and is far from being a simple stakeholder. It was this distinction which led the court in Argonaut Ins. Co. v. United States, 434 F.2d 1362, 193 Ct.Cl. 483 (1970), involving facts similar to those presented in this case, to reject the surety's argument that once the surety notified the defendant of the contractor's failure to meet its obligations the Government was under a legal obligation to stop making payments which were inconsistent with the surety's rights. The court said:

'. . . . to hold the Government liable to plaintiff under the circumstances in this case grants the payment bond surety economic control of both the decision to terminate and the completion of the contract. [434 F.2d at 1367, 193 Ct.Cl. at 492.]'

Thus, where the Government representative is notified of the contractor's nonpayment of obligations dur-ing the performance of the contract, the representative is faced with the task of balancing the Government's interests in proceeding with the contract, against possible harm to the surety. The court in *Argonaut* stated that: 'During the performance of the contract, the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract.' 434 F.2d at 1368, 193 Ct. Cl. at 495. The key question then becomes whether the Navy's contracting officer did in fact responsibly exercise the discretion given him."

Our initial inquiry then is whether the contracting officer abused her discretion in the making of progress payments to the contractor despite protests by the surety. On the facts before us, we conclude there was no abuse of discretion on the part of the contracting officer.

■ The government's primary interest during performance of the contract is with completion of the job. There exists various unforeseen difficulties which may hinder performance, thus considerable flexibility must be afforded the government in administering the contract. See United States Fidelity and Guaranty Co., et al. v. United States, *supra,* and Argonaut Ins. Co. v. United States, *supra.* Simply because the government has knowledge of certain unpaid laborers and materialmen but performance is not in default the government should not be placed in a position of withholding or misdirecting progress payments and thereby jeopardize its right to performance and open itself to a breach of contract action by the contractor. Continental Casualty v. Public Bldg. Authority of the City of Scottsboro, 381 F.2d 10 (5th Cir. 1967). It is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract. The government cannot lightly withhold funds the contractor may need for this purpose. United States v. Lennox Metal Mfg., 225

F.2d 302 (2nd Cir. 1955). In the instant case the work on the contract was proceeding smoothly and on schedule, and the contract was in fact completed satisfactorily.

On a subrogation claim similar to that asserted by the plaintiff here, the court in Argonaut Ins. Co. v. United States, *supra*, stated:

" . . . we call attention to the well-established principle that the subrogation right claimed by plaintiff is not a right that springs from contract but is merely a creature of equity, to be carried out in the exercise of equitable discretion and with due regard to the legal and equitable rights of others. National Sur. Corp., et al. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724, cert. denied, First Nat'l Bank in Houston v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955); Compania Anonima Venezolana De Nav. v. A. J. Perez Exp. Co., 303 F.2d 692 (5th Cir. 1962). The rules that govern when a claimed right of subrogation conflicts with other rights of higher rank have been well expressed in 50 Am.Jur., *Subrogation*, § 13 at 691–92:

'§ 13. *Weighing or Balancing Equities or Rights.*—As in other cases of equitable relief, the court in adminstering subrogation will weigh and balance the equities of the parties, and have due regard to the legal and equitable rights of others. Subrogation will not be enforced to the prejudice of other rights of equal or higher rank, or to displace an intervening right or title, or to overthrow the equity of another person. Nor will it be enforced at the expense of a legal right or where the rights and interests of the creditor will be imperiled or prejudiced.'

The application of these general rules depends, of course, upon the facts and circumstances of each case, but we think they provide the guidelines for deciding the issue involving the progress payment."

When a surety undertakes a payment bond he promises to pay promptly. The surety is paid to assume the risks required by the payment bond. One of the basic risks reasonably to be expected is that if materialmen are not paid by the contractor (principal) they may turn to the surety for timely payment. Once the surety executes this responsibility, he unequivocally becomes subrogated against the Government. Had the plaintiff paid the supplier, Swiff-Train, when it was called upon to do so, in December of 1969 or January of 1970, it would have become subrogated long before the last progress payment by the defendant on March 9, 1970.

In his letter of February 17, 1970 to Mr. Gary Norton (Attorney for Swiff-Train), Mr. N. Thomas Martin (on behalf of Fireman's Fund) stated:

"Your letter of February 14, 1970 just reached me this morning.

Please be assured that we have no intention of disregarding the claim being asserted on behalf of your client, the Swiff-Train Company. Instead, the unavoidable delay has been caused by the difficulty in effecting direct contact with our Principal (whose business, as you know, causes him to travel extensively).

In addition, our Principal has indicated a strong desire to discharge his obligations directly, and if at all possible, we would like to accommodate him insofar as this is reasonable. Naturally, we appreciate that your client cannot be asked to defer action indefinitely, but it would be my feeling that within 10 days to 2 weeks we should know definitely whether Mr. Scheven is going to perform directly. Your indulgence for this short additional time will be deeply appreciated."

The letter clearly establishes that as late as February 17, 1970, plaintiff had neither paid any money nor looked to any-

one but Scheven for satisfaction of Swiff-Train's claim.

Under the admitted facts, we deem the correspondence and other communications insufficient to constitute notice or demand upon the government. The most that can be said is that Swiff-Train was eager to be paid; that the surety continued to look to the principal, Scheven, for payment; and that the surety merely informed the government that the surety desired to administer subsequent progress payments. The only letter which could possibly suffice as a demand was Scheven's letter of direction, dated February 25, 1970 and sent March 5, 1970 to the Finance Office at Mc-Connell, which was not received until after the contracting officer had disbursed the final progress payment of $4,344.44 to Scheven on March 9, 1970.

The court concludes that despite the fact that the surety informed the government that the contractor was in financial difficulty and delinquent in a debt to a supplier, the government was under no duty to make progress payments to the surety, so long as the government took reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job. Insofar as the government was concerned, Scheven was still satisfactorily performing the contract and therefore had a right to receive the earned progress payments. Plaintiff could easily have become subrogated and it paid the supplier before March 9, 1970, or had the government received Scheven's letter of direction before disbursing the final progress payment. Under all the facts and circumstances plaintiff acquired no legal or equitable subrogation rights against the defendant. Accordingly, except for the sum of $664.21 which is held by the defendant and to which plaintiff admittedly is entitled, plaintiff's claim for subrogation on the Mc-Connell Air Force project must fail and judgment should be entered in favor of defendant.

II. FORT GEORGE MEADE. The dispute arising out of the Fort George Meade contract deals with a progress payment in the amount of $5,119.32 and the final payment in the amount of $3,017.15, both of which were made to the contractor Scheven by the defendant. Plaintiff claims entitlement to the first $5,072.41 of the combined amounts of these payments. The following facts are stipulated:

1. On or about February 18, 1969, defendant and Scheven executed Contract No. BABB–05–69–C–0191 for certain work to be performed at Fort George Meade, Maryland.

2. Plaintiff entered into payment bond No. SC–6163158 with Scheven with respect to said contract. Defendant is the obligee upon said bond.

3. By letter dated December 18, 1969, a copy of which was sent to and received by the Contracting Officer at Fort George Meade, Mr. Gary Norton, attorney for the Swiff-Train Company, made demand upon Scheven for the amount of $3,710.89 for materials allegedly furnished by his client in connection with the project at Fort George Meade.

4. On January 2, 1970, the United States paid a progress payment to Scheven in the sum of $5,119.32.

5. On January 21, 1970, the United States made a final payment to Scheven in the amount of $3,017.05.

6. By letter dated January 23, 1970, and sent by certified mail to the Contracting Officer at Fort George Meade, plaintiff notified said officer that it had received notice of claims against Scheven by alleged materialmen, and requested that officer to forward all further sums falling due under the contract to Scheven, in care of plaintiff, in order to assure proper application of said funds.

7. On or about February 13, 1970, Mr. Gary Norton, on behalf of the Swiff-Train Company, sent a letter to plaintiff, copy to the Contracting Officer of Fort George Meade, advising that Scheven had not paid his client, and that if payment was not forthcoming within one week, he would file suit against Scheven and plaintiff.

8. By letter dated March 5, 1970, plaintiff sent Scheven's letter of direction dated February 25, 1970, to the Contracting Officer of Fort George Meade.

9. On or about March 11, 1970, in accordance with its obligation under its payment bond and the Miller Act, plaintiff paid to Swiff-Train Company $3,710.89, the amount owing by Scheven on the Fort George Meade contract.

10. Scheven also failed to pay others among his materialmen, and accordingly, on April 1, 1970, plaintiff paid $1,361.52 to Georgia Pacific Corporation for materials furnished in connection with the Fort George Meade project.

■ For the reasons previously discussed with respect to the McConnell project, plaintiff's claim under the foregoing facts is without merit. Here, both the progress payment and final payment were made by the government to Scheven before the surety made any attempt to honor its bond or give notice or make demand upon the defendant. The surety's attempts to inform the government of the contractor's nonpayment of certain materialmen after the government's final payment to the contractor were of no consequence insofar as the surety's subrogation rights against the government are concerned.

Accordingly, judgment must be entered for defendant with respect to plaintiff's claim on the Fort George Meade project.

III. FORT SAM HOUSTON. The dispute arising out of the Fort Sam Houston contract deals with the sum of $1,749.45 which amount was levied upon by the Internal Revenue Service while in the hands of the defendant and which amount would have been the final payment due Scheven under this contract. Plaintiff claims its right to this money is superior to the Internal Revenue Service levy.

The following facts are stipulated:

1. On or about October 7, 1968, defendant and Scheven executed Contract No. DABD-11-69-00210 for certain work to be done and performed at Fort Sam Houston, Texas. Plaintiff and Scheven entered into payment bond No. SC-6163076 to cover said project. Defendant is the obligee upon said bond.

2. By letter dated December 18, 1969, a copy of which was sent to and received by the Contracting Officer at Fort Sam Houston, Mr. Gary Norton, attorney for the Swiff-Train Company, made demand upon Scheven for $8,835.-48 for materials and labor allegedly furnished by his client in connection with the project at Fort Sam Houston.

3. By letter dated January 20, 1970, received by the plaintiff the following day, the Murray B. Marsh Company made claim in the amount of $7,063.23 for materials furnished to Scheven in connection with the Fort Sam Houston project.

4. By letter dated January 23, 1970, sent by certified mail to the Contracting Officer at Fort Sam Houston, plaintiff notified that officer that it had received notice of claims against Scheven by alleged materialmen, and in order to assure their payment, plaintiff requested that all further sums falling due under the contract be forwarded to Scheven, in care of the plaintiff.

5. By letter dated January 28, 1970, the Contracting Officer at Fort Sam Houston denied this request on the grounds that ". . . the Government is not allowed to withhold contract payments due to the contractor or his assignee for the reason that subcontractors or suppliers have not been paid for work performed or supplies delivered."

6. By letter dated January 29, 1970, the Contracting Officer at Fort Sam Houston notified plaintiff that on that date a retainage of $1,749.45 was being withheld.

7. By letter dated February 13, 1970, Mr. Gary Norton, on behalf of the Swiff-Train Company, wrote plaintiff, copy to the Contracting Officer at Fort

Sam Houston, advising that Scheven had yet to pay his debt to his client and that unless payment was forthcoming within one week, he would file suit against Scheven and plaintiff.

8. By letter dated March 5, 1970, plaintiff forwarded Scheven's letter of direction dated February 25, 1970, to the Contracting Officer at Fort Sam Houston.

9. On or about March 11, 1970, in accordance with its obligation under its payment bond and the Miller Act, plaintiff paid to Swiff-Train Company $8,835.28, the amount owing by Scheven on the Fort Sam Houston contract.

10. By letter dated April 23, 1970, the Contracting Officer notified plaintiff that it could not forward any money to plaintiff because on April 2, 1970, the Internal Revenue Service had served a notice of levy upon Scheven.

11. Scheven also failed to pay others among his materialmen, and accordingly, plaintiff was forced to pay said claims as hereinbelow listed:

(a) On July 29, 1970, plaintiff paid $7,323.00 to the Murray B. Marsh Company for materials furnished in connection with the Fort Sam Houston project; and

(b) On October 2, 1970, plaintiff paid $356.30 to the John B. Kuntz Lumber Co. for materials furnished in connection with the Fort Sam Houston project.

The question presented on this claim is whether the rights of the surety to the retained sum of $1,749.45 are superior to those of the Internal Revenue Service obtained from its levy of April 2, 1970, for unpaid taxes against the contractor, Scheven.

■ Plaintiff again relies upon the theory of subrogation while the government contends that the Internal Revenue Service, by virtue of its assessment and levy, acquired superior rights to the money withheld on Scheven's contract. We believe the government's position is well taken. We cannot accept plaintiff's argument that at the time of the levy

Scheven had no right to the funds retained, and plaintiff, having paid Scheven's suppliers, was subrogated to the funds in the hands of the government.

Determination of this issue is controlled by United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). There it was held that the government is entitled to exercise its right of set-off against money in its hands and due a contractor as opposed to the right of a surety who has fulfilled its obligation by making payment to materialmen and laborers. Had the plaintiff paid on a performance bond, rather than a payment bond, there might well be merit to its contention. See Aetna Insurance Company v. United States, 456 F.2d 773, 197 Ct.Cl. 713 (1972), where the court stated:

"Later cases, relying on Munsey Trust, have held that a Miller Act surety who completes the contract on default of the contractor is entitled to the contract retainages in the hands of the Government, free from setoff for taxes owed by the contractor. However, *each of these decisions reaffirmed the Munsey rule in situations where the government's right of set-off is challenged by the surety under its payment bond.*" (*citations omitted.*) (*emphasis added.*)

In the recent case of United States Fidelity and Guaranty Co., et al. v. United States, *supra,* the Court of Claims expressly relied on the *Munsey* decision, and stated:

". . . A surety that pays on a performance bond in order to complete the subject contract has priority over the United States to the retainages in its hands. A surety that pays on its payment bond, however, does not have priority when the United States is asserting a tax or other obligation owed by the prime contractor. Since the surety in this case paid only on its payment bond, it falls in the latter category, and must claim the retainage subject to the tax claim of the United States . . ." (*citations omitted.*)

Under the facts here, plaintiff's claim is inferior and the government is entitled to judgment.

It is by the Court ordered that judgment be entered in favor of defendant as to plaintiff's claims on all three projects except for the sum of $664.21 for which amount all parties agree plaintiff is entitled to judgment against the defendant.