**ROYAL INDEMNITY COMPANY**

v.

**The UNITED STATES.**

**No. 161–67.**

United States Court of Claims.

Jan. 28, 1976.

Richard H. Nicolaides, Washington, D. C., atty. of record, for plaintiff.

Leslie H. Wiesenfelder, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and DAVIS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision, filed October 9, 1974, by Trial Judge Harry E. Wood, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the recommended decision, as hereinafter set forth,[*] it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

### WOOD, Trial Judge:

In this action, again before the Trial Division for recommended decision on the merits,[1] plaintiff, payment and performance bond surety on a 1960 contract whereby Grenco Services, Inc. (hereinafter "Grenco") undertook to construct for defendant a "Gas Dynamics Facility Hyperballistics Range, including Range Auxiliary Building" at the Arnold Engineering Development Center, Tullahoma, Tennessee (hereinafter "the Tullahoma project contract" or "the Tullahoma project"), here seeks to recover from defendant some $254,000.

The gross amount in suit is the total of six progress payments made by defendant to Grenco prior to defendant's termination of Grenco's contract for default, but after subsequently described events which, according to plaintiff, required that defendant either forward progress payments to Grenco in care of plaintiff, "thus affording [plaintiff] joint control" over the funds, or at least withhold them from Grenco, "thereby assuring that the monies would be used first, to complete the project, and second, to pay the job obligations."[2]

### I.

### The Court's Order of Remand

In a recommended decision filed herein February 25, 1972, the trial judge reached neither plaintiff's elaborate chain of argument supporting its view that by making the six progress payments to Grenco defendant had breached an obligation to see that all of the monies so paid were devoted to the completion of the Tullahoma project, and that plaintiff was accordingly entitled to recover all such monies from defendant, nor the broadest of defendant's several contentions: that, absent a declaration by the contracting officer that Grenco was in default of its contract with defendant, defendant had neither a right nor a duty to withhold earned progress payments. It was held, rather that even assuming "defendant could and should have given more consideration to 'the surety's interest in conjunction with other problems encountered in the administration of the contract',[3] the extent, if any, of resulting damage to plaintiff cannot be measured", and that plaintiff, having failed to establish that any measurable portion of its overall loss on the Tullahoma project was fairly attributable to defendant, was accordingly not entitled to recover.

Following oral argument on plaintiff's request for review of the said recommended decision,[4] the court, by order dated October 20, 1972, remanded the case to the trial judge with directions to determine, in essence, whether, in making the progress payments in question to

---

[*] Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his recommended decision filed October 9, 1974, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. See pp. 1313–1314, *infra.*

2. Plaintiff now concedes that the gross amount claimed should be reduced by "any portion thereof that has been established as used in connection with the project."

3. *Argonaut Ins. Co. v. United States,* 434 F.2d 1362, 1368, 193 Ct.Cl. 483, 495 (1970).

4. The briefs and exceptions of the parties in connection with the request for review reflect that the contentions pressed before the trial judge were also urged upon the court.

Grenco, defendant acted in good faith and primarily to promote the continuation of the contract work, and whether, in light of all the facts and circumstances, defendant's actions were a reasonable exercise of its discretion or an arbitrary disregard of plaintiff's rights as surety and an abuse of such discretion.

Thereafter, the parties were afforded an opportunity to present further proof. Neither offered any further testimony, but documentary evidence on behalf of both was offered and received. Proof was closed in due course, and the issues framed by the order of remand are now ripe for decision. For reasons which follow, it is concluded that plaintiff is not entitled to recover.

## II.

### The Facts of the Case

A fairly detailed factual background is a prerequisite to clear perception and resolution of the difficult considerations here involved.

Grenco's bid of $1,329,444 on the Tullahoma project was $292,000 less than that of the next lowest bidder, and $621,000 less than defendant's own estimate of the cost of the work. At defendant's request, Grenco confirmed its bid, and, on July 22, 1960, it entered into the Tullahoma project contract with defendant at its bid price. Grenco then obtained from plaintiff a performance bond in the sum of $1,329,444, and a payment bond in the sum of $531,777.60, and commenced work on the project shortly after August 8, 1960, when it received notice to proceed. Work was to be completed within 540 days from commencement.

Grenco's application to plaintiff for both bonds was dated August 2, 1960, and was made on a Royal Indemnity Company form containing (among other things) an "Agreement of Indemnity" giving plaintiff a considerable number of

rights vis-a-vis Grenco. There is no indication in the record that plaintiff then had any information about Grenco beyond that stated in the application form. Despite Grenco's failure to respond to many of the requests for information on the said form, there is also no indication that plaintiff sought any further information from or about Grenco prior to execution by it of Grenco's payment and performance bonds.

Problems soon began to surface. By letter of March 2, 1961, to Grenco, plaintiff in substance alluded to Grenco's failure to pay Southern Steel Products, Inc., Grenco's reinforcing steel subcontractor, and Oman Construction Company, Inc., its excavation subcontractor, a total of $46,863.55.[5] Plaintiff demanded that Grenco deposit, within 10 days, funds to cover the reserve plaintiff deemed it necessary to establish as a result of Southern's and Oman's claims, and that Grenco afford plaintiff the right to audit Grenco's books and records. On refusal of the right to audit, plaintiff stated, "we will pursue our remedy at law." Plaintiff also stated it would "take immediate steps to exercise joint control of this contract", and threatened "legal steps to impress a trust upon the funds coming out of this contract."

Thereafter, serious problems continued to emerge. By early May 1961, Grenco, even with a time extension of 111 days, was well behind schedule on job progress. Moreover, although defendant had paid to Grenco a total of $193,014.61 (including some $45,000, less retainage for excavation) on Progress Payment Estimates 1–8, covering the period ending April 15, 1961, Oman, whose earthwork operations were crucial to progress, had ceased work, and had advised Grenco (and plaintiff) it would not go back to work until paid.

Plaintiff was also then aware of complaints by Southern and by other subcon-

**5.** In early February 1961, defendant was advised by Southern that while it had "shipped approximately half of the job", Southern had thus far received no payment from Grenco.

Later that month Southern presented a claim for $20,836.90 to plaintiff. Oman also then advised plaintiff of its unpaid invoice for $26,026.65.

tractors and materialmen, that Grenco had not paid for contract work and materials. Defendant too, then knew of Southern's complaints, and it had also received advice from Standard Iron & Wire Works, Inc., and Ingalls Iron Works Company of Grenco's failure to pay for materials delivered to the Tullahoma project.[6] Defendant was, of course, also aware that Oman's earthwork operations had ceased.

On May 1, 1961, several representatives of defendant met with a representative of Grenco to discuss the status of construction of the Tullahoma project. It was noted that, even with a time extension of more than 100 days, construction was "more or less lagging", and that efforts to bring progress up to, or ahead of, the projected curve should be made. Plaintiff had by then become quite concerned about the situation, and, on May 11, 1961, a representative of plaintiff met with representatives of Grenco in New York with respect to the financial aspects of the matter.

At the May 11, 1961 meeting in New York, Grenco representatives executed a number of documents prepared, or drafted, by or for plaintiff. The documents included a letter, dated May 11, 1961, from Grenco to defendant, in essence "irrevocably" authorizing and directing defendant to send any payments due Grenco in connection with the Tullahoma project "to the order of Grenco * * * directly to [plaintiff]", an assignment from Grenco to plaintiff, a power of attorney, and a "joint control" agreement.

The "joint control" agreement stated, among other things, that Grenco had "been unable to pay job obligations to job creditors * * * and pursuant to the terms and conditions of the agreement of indemnity with [plaintiff] has been and is in default in connection therewith; and has been unable to progress the work by reason thereof", and that it intended by the "joint control" agreement to afford plaintiff "joint control over all and any of said [contract] funds."

Plaintiff promptly mailed to defendant a copy of Grenco's May 11, 1961 letter. Whether it also then mailed to defendant a copy of each of the other documents signed by Grenco on May 11, 1961, is uncertain, but in any event, defendant was given a complete set of the documents before June 7, 1961, when it made the first of the six progress payments here in issue to Grenco. Accordingly, it is unnecessary to decide what plaintiff sent to defendant immediately after the May 11, 1961 meeting.

In mid-May 1961, plaintiff met a Grenco payroll (or payrolls) in amount of some $4,000, and it made a commitment to Grenco to pay two of Grenco's job creditors (Oman and Southern). On May 15, 1961, plaintiff increased its reserve on the Tullahoma project to $175,000, and on May 16, 1961, plaintiff forwarded to Southern and to Oman a release, together with advice that upon execution and return of the release to plaintiff, the amount Grenco owed the job creditor would be paid. Plaintiff did not, however, pay either Southern or Oman. After June 7, 1961, Grenco paid Southern's claim, and it also paid some (and probably all) of Oman's claim.

On May 19, 1961, Grenco's counsel orally advised plaintiff that Grenco would be unable to meet the project payroll due that day, and that, unless plaintiff wanted to do something about it, the project would have to go into default. Plaintiff made "no offer". Plaintiff's representatives were then at Grenco's offices in Flushing, New York, for the purpose of determining the estimated costs of completion of the Tullahoma project. After plaintiff's reaction to Grenco's oral advice, Grenco's president received a telephone call. He then told plaintiff's representatives to leave, and they did so.

On May 19, 1961, Grenco addressed letters to plaintiff and to defendant. Grenco's letter to defendant stated,

---

6. According to the record, Grenco owed Standard $10,380.86, and Ingalls $36,776, in April 1961.

among other things, that "The authorization sent you in our letter of May 11, 1961 is hereby withdrawn", that payments due Grenco should be mailed directly to Grenco, and that any "authorization or claimed authorization which [plaintiff] asserts is canceled." Grenco's letter to plaintiff stated, among other things, that "you do not intend and never did intend to carry out the arrangements of cooperation which were set up between us", that plaintiff's actions had not been in good faith, that Grenco "hereby" canceled and revoked all of the authorizations and powers it had executed on May 11, 1961, and that Grenco had "withdrawn" the instructions contained in its letter of May 11, 1961, to defendant. It is reasonable to infer that Grenco's said letters followed the events described in the preceding paragraph.

By letter of May 19, 1961, to Grenco, with a copy to plaintiff, defendant noted that while progress of the Tullahoma project as a whole was primarily dependent upon the completion of earthwork, no earthwork was in process, and that Grenco's continued delay in proceeding with this phase of the work was adversely affecting the overall job progress. Defendant directed that Grenco take action to improve its progress, and stated that failure to comply with its directive might, in substance, trigger a decision to terminate Grenco's right to proceed with the work.

On May 22 or 23, 1961, representatives of plaintiff and defendant met at the Tullahoma project to discuss Grenco's progress and existing problems. In Tullahoma, Grenco's May 19, 1961 letter to defendant was shown to plaintiff's representatives. Defendant's representatives indicated general satisfaction with the quality of Grenco's work, but not with its quantity. In their view, the crux of the problem was Oman's failure to continue the excavation work. Both plaintiff and defendant were aware, at

that time, of claims by some Grenco suppliers of Grenco's nonpayment of bills.

By letter of May 24, 1961, to defendant, plaintiff indicated that it regarded Grenco's May 11, 1961 authorization to defendant to send payments in connection with the Tullahoma project to plaintiff as "irrevocable and fully operative, notwithstanding subsequent letter of withdrawal to the contrary." Some time between May 19 and May 25, 1961, however, Grenco's attorney orally asserted to defendant that plaintiff had "breached its agreement" with Grenco.

On May 25, 1961, plaintiff's and defendant's representatives again discussed the progress of the work. The impact of Grenco's financial situation on job progress was at least mentioned. At the end of the discussion, defendant's representatives concluded that plaintiff's representatives were greatly concerned over the situation, and that after they had reported to plaintiff's New York office a decision as to plaintiff's action would be forthcoming. Plaintiff did not, then or thereafter, request that defendant either declare Grenco in default or terminate Grenco's right to proceed.[7]

By May 25, 1961, a progress payment, in the amount of approximately $90,000, was ready to be issued, and the Army Engineer District, Mobile, Alabama, which had jurisdiction over the Tullahoma project, sent a teletype to the Division Engineer, South Atlantic Division, Atlanta, Georgia, seeking instructions with respect to the progress payment. The said teletype alluded to Grenco's letters of May 11 and May 19, 1961, to defendant, plaintiff's May 24, 1961 letter to defendant, and to Grenco's oral advice that it was legally entitled to, and needed, the progress payment. It also stated, among other things, that several of Grenco's suppliers and subcontractors had accounts due and unpaid; that Grenco was behind schedule; that Grenco might be forced into default through

---

7. By letter of September 8, 1961, to defendant, plaintiff did state that it was considering taking over the work. On that same day, however, the Mobile District Engineer requested of his superiors authority to terminate Grenco's right to proceed.

failure to receive a current payment; that, if made, the payment might not be enough to satisfy all claims; that plaintiff might refuse to take over and complete the work; and that there was no "formal assignment under the contract."

On or about June 1, 1961, plaintiff requested that Washington counsel ascertain whether the $90,000 progress payment referred to above had been made. There followed, during the period June 1–7, 1961, an extensive and involved series of communications between plaintiff and defendant, between Grenco and defendant, and between the Office of the Chief of Engineers, Washington, D. C. and Corps of Engineers offices in Atlanta and Mobile. So far as the findings show, however, there was a notable lack of communications between plaintiff and Grenco during the period May 19, 1961 to June 7, 1961, when defendant's decision to deliver the progress payment check to Grenco was made.

The events of June 1–7, 1961, are fully detailed in the findings. Briefly, plaintiff maintained throughout that period that the progress payment check should be delivered to plaintiff, not to Grenco. Defendant, which had already held up the check for about a week, was under increasing pressures from another direction as well. On June 5, 1961, it was advised that Grenco had to have money to keep going; that Grenco had made arrangements to get its subcontractors back on the job;[8] that all major subcontract work on the project had ceased, that only a small crew was working, and that within 48 hours all contract work would stop; that Grenco's subcontractors were refusing to proceed because of failure to receive payments; that Grenco was accusing defendant of breach of contract; that if defendant did not pay over the current payment Grenco would be forced to shut down the job; that, if Grenco did so, there was no indication plaintiff would take over the work; and that, in view of Grenco's low bid, excess costs on readvertisement would for that reason alone be considerable.

The facts reflect that during this period defendant considered withholding all progress payments until plaintiff and Grenco could reach an agreement on check delivery, or until the matter could be resolved by litigation, and that defendant did endeavor, albeit unsuccessfully, to have the disputants resolve their differences themselves.

Both plaintiff's main office and Grenco's office were in New York. On June 1, 1961, the Office of the Chief of Engineers suggested to the contracting officer that he arrange an immediate meeting with plaintiff and Grenco to resolve, if possible, the problem of where payments to Grenco should be mailed. On June 2, 1961, the Mobile Army Engineer District orally asked plaintiff's New York office whether any agreement had been reached, and indicated that absent some agreement defendant would be forced to make the payment to Grenco. Plaintiff's response was that no agreement with Grenco could be reached, but that release by defendant of the check to Grenco would be at defendant's peril. The facts also reflect that defendant gave careful consideration to the question whether the "assignment" from Grenco to plaintiff complied with the Assignment of Claims Act, 31 U.S.C. § 203, and there is no contention that, in answering that question in the negative, defendant erred. Indeed, plaintiff implicitly concedes that any rights it may have herein must derive from the "joint control" agreement and an asserted abuse of discretion, not from the "assignment."

On June 7, 1961, the Office of the Chief of Engineers instructed the Mobile Army District Engineer, through the South Atlantic Division, that absent a proper assignment the progress payment check should be delivered to Grenco, and the check was in fact airmailed to Grenco in New York on June 7. Plaintiff was promptly so advised.

---

8. The implication that payment to the subcontractors was a prerequisite to their return to work is, on this record, patent.

Following June 7, 1961, Grenco got Oman to return to the job, and advised defendant (erroneously, as it turned out) that all claims "against" the Tullahoma project had been satisfied. Its financial situation remained "tight", however, and in early July 1961 defendant approved "bi-weekly" progress payments to Grenco in lieu of making them at approximate monthly intervals as theretofore.

Following June 7, 1961, Grenco also made payments, totaling some $62,000, to Southern, Oman, and Ingalls, and it met its payrolls for a time, applying at least $50,000 of the monies paid to it by defendant on and after June 7, 1961, to Tullahoma project payrolls. Although Grenco's overall actual completion remained behind schedule, it was, by early August 1961, working 6 days a week, 10 hours per day, and making excellent progress on the work. As the findings reflect, however, serious problems remained.

By letter of August 30, 1961, to plaintiff, Grenco stated that it desired a "loan guaranteed in the amount of $200,000", to be repaid at the rate of $25,000 per month. Grenco proposed to sign over the monies due it on the Tullahoma project to a recognized financial institution, and stated that "we also hereby authorize" plaintiff to countersign Grenco checks for payments and obligations under the Tullahoma project contract. The record contains no formal reply by plaintiff to Grenco's August 30, 1961 letter, but plaintiff did decline to guarantee any such loan to Grenco.

By letters of September 7, 1961, plaintiff communicated with three banks, two in New York and one in Tullahoma. Each of plaintiff's letters alluded to a completed or imminent advance of funds to Grenco on the strength of the Tullahoma project contract; stated that any monies advanced on the strength of documents relating to the project were trust funds subject to plaintiff's joint control, and that any assignment from Grenco would be subordinate to plaintiff's rights; and advised that plaintiff would enforce its agreement of indemnity with Grenco by legal action if need be.

On September 8, 1961, shortly after receiving advice from Grenco's Range Tube [9] supplier that Grenco owed it some $74,000 for materials delivered to the Tullahoma project, and that it had received no payments from Grenco, defendant sought a conference with Grenco and plaintiff. Also on September 8, 1961, plaintiff wrote to defendant (with a copy to Grenco) to say, among other things that the Tullahoma situation had deteriorated; that its rights as surety were "being jeopardized by our principal's failure to perform"; that it had the right, under its agreement of indemnity with Grenco, to declare Grenco in default and to take over the work and arrange for its completion; and that it was considering implementing that agreement. A meeting with defendant was requested.

On September 14, 1961, representatives of plaintiff, defendant, and Grenco met at Grenco's offices in New York. In the interim, defendant had decided that unless the forthcoming conference produced satisfactory arrangements for expediting the contract work and regaining progress efficiency, Grenco's right to proceed should be terminated. The September 14, 1961 meeting was essentially unproductive, and by letter of September 19, 1961, defendant terminated Grenco's right to proceed effective September 20, 1961, and declared Grenco in default.

Between June 7 and September 19, 1961, defendant paid to Grenco six progress payments totaling $254,064.83. The June 7 progress payment amounted to a little more than $81,000; the remaining five progress payments totaled approximately $173,000. The last pay-

---

9. The Range Tube was a major component of the Gas Dynamics Facility Hyperballistics Range, with an estimated cost of $196,072. In payment estimates for the periods ending July 10 and July 25, 1961, Grenco had included $35,000 under Feature Control Item No. 5, Range Tube. In Payment Estimate 14, covering the period August 11–25, 1961, Grenco included an additional $25,000 under Feature Control Item No. 5.

ment estimate paid to Grenco covered the period August 10–25, 1961. While the check in payment therefor, for $45,-426.71, was dated August 30, 1961, the evidence suggests that it was in fact released to Grenco a few days thereafter.

Following September 19, 1961, plaintiff obtained a contractor to complete the Tullahoma project, and the project was completed and accepted by defendant July 12, 1963. Plaintiff expended some $300,000 under its performance bond and some $386,000 under its payment bond, in connection with Grenco's Tullahoma project contract.

### III.
### The Issues Framed by the Court's Order

The court's order of remand poses the questions whether defendant, in making the progress payments in question to Grenco, acted in good faith and primarily to promote the continuation of the contract work, and whether, in light of all the facts and circumstances, defendant's actions were a reasonable exercise of its discretion or an arbitrary disregard of plaintiff's rights as surety and an abuse of such discretion.

It is clear both that defendant's good faith in making the said progress payments to Grenco cannot seriously be challenged, and that defendant's actions had as their primary purpose promotion of the continuation of the contract work. Indeed, analysis of plaintiff's arguments reveals that plaintiff does not really contend to the contrary. Its position, rather, is that defendant's good faith and primary purpose "are not the governing factors in this matter since its actions were not a reasonable exercise of its discretion under all these circumstances", and that the same facts justifying that conclusion also established an arbitrary disregard of plaintiff's rights as surety and an abuse of discretion.

With commendable forthrightness, defendant recognizes that when the facts and circumstances are viewed objectively "there is no ready answer to the ques-

tions posed by the Court in its Order of October 20, 1972," and that these questions are troublesome and difficult ones. In defendant's view, however, there was not abuse of, but rather a reasonable exercise of, discretion in all the circumstances, with due regard to plaintiff's interests as surety, not arbitrary disregard thereof.

In evaluating the conflicting positions of the parties, it is critical to note at the outset that the Tullahoma project was far from completion at the time defendant paid the sums here in controversy to Grenco. Thus, the issue is wholly unrelated to which of two or more competing claimants is entitled to receive a final contract payment. Nor was defendant "merely a stakeholder, its interest * * satisfied once the project was completed", but a contractually bound, and vitally interested, party to an ongoing construction project. *United States Fidelity & Guar. Co. v. United States,* 475 F.2d 1377, 1384, 201 Ct.Cl. 1, 13 (1973). See also *Argonaut Ins. Co. v. United States,* 434 F.2d 1362, 193 Ct.Cl. 483 (1970); *Fireman's Fund Ins. Co. v. United States,* 362 F.Supp 842 (D.Kan.1973); *United States v. Continental Cas. Co.,* 346 F.Supp. 1239 (N.D.Ill.1972).

As this court said in *Argonaut, supra,* 434 F.2d at 1367–68, 193 Ct.Cl. at 493–494:

> During performance, the Government's role is substantially different from that of a mere stakeholder of a final contract payment. The defendant has an important interest in the timely and efficient completion of the contract work. In furtherance of this interest, the Government contracts for a broad range of rights which are designed to promote continuation of the contract work. These provisions give the Government considerable discretion and flexibility in administering the contract. Public policy supports this flexibility in light of the various unforeseen circumstances which may hinder performance.

Notwithstanding its own interests, however, defendant has a clear

duty, even during the performance of the contract, to exercise its discretion responsibly, and to consider the interests of a surety in conjunction with the other problems it may encounter in the administration of the contract. *Argonaut Ins. Co. v. United States, supra.* As the court put it in *United States Fidelity & Guar. Co. v. United States, supra,* defendant must balance its own interests in proceeding with the contract against possible harm to the surety. Thus, the crucial question is whether there was, in this case, a reasonable and responsible exercise of discretion in the decision not to deliver progress payment checks to plaintiff, but to make progress payments directly to Grenco.[10]

The standard of proof to be applied in a case where an arbitrary and capricious disregard of the surety's interests, and an abuse of discretion, are charged must be, and is, high. See *Keco Indus., Inc. v. United States,* 428 F.2d 1233, 192 Ct.Cl. 773 (1970). Where, as here, defendant is entitled to exercise its discretion, "plaintiff has an unusually heavy burden of proof in showing that the determination made * * * was arbitrary and capricious." *Continental Bus. Enterprises, Inc. v. United States,* 452 F.2d 1016, 1021, 196 Ct.Cl. 627, 637 (1971). See also *Excavation Constr., Inc. v. United States,* 494 F.2d 1289, 204 Ct.Cl. 299 (1974); *Eggers & Higgins v. United States,* 403 F.2d 225, 235, 185 Ct.Cl. 765, 784 (1968).

Plaintiff vigorously asserts that defendant not only was of the opinion that it had no discretion to exercise, and thus exercised none, but in any event failed to consider at all a number of factors which made completion of the Tullahoma project by Grenco impossible. According to plaintiff, all defendant had to do in this case was simply to honor Grenco's May 11, 1961 authorization, and, it urges, defendant's failure to do so here amounted to arbitrary and capricious disregard of plaintiff's rights.

As will be seen, plaintiff's position is far too simplistic. As defendant properly suggests, when the facts and circumstances of the case are viewed objectively, the factors relevant to a conclusion with respect to abuse of discretion *vel non* do not point unmistakably to any clear and simple answer. The issue is exceedingly complex, and very close.

Shortly after Grenco's May 11, 1961 authorization to defendant to send checks payable to Grenco in care of plaintiff, Grenco advised both plaintiff and defendant that it had rescinded that authorization. In May 1961, Grenco also advised defendant that plaintiff had breached an agreement with Grenco. Grenco also made it clear to plaintiff at that time, that, in Grenco's view, plaintiff had failed to comply with its obligations to Grenco. Grenco's said actions followed its oral advice to plaintiff that unless plaintiff wanted to do something about Grenco's inability to meet a payroll, the project would have to go into default, and it is reasonable to conclude that they were precipitated by the fact that, in response, plaintiff made "no offer".

Thus, without regard to the rightness, or wrongness, of Grenco's and plaintiff's respective positions, defendant, in a very real sense, was caught between the conflicting demands of Grenco, to whom it had an explicit contractual obligation, and of plaintiff. Plaintiff's rights as against defendant were not contractual in nature, but purely equitable, and were to be considered "in the exercise of equitable discretion and with due regard to the legal and equitable rights of others." *Argonaut Ins. Co. v. United States, supra,* 434 F.2d at 1367, 193 Ct.Cl. at 493.

In late May 1961, both plaintiff and defendant were well aware of claims by Grenco's subcontractors and suppliers of Grenco's nonpayment of bills. In defendant's view, the quality of Grenco's work was good, although the quantity of Grenco's performance was less than sat-

**10.** This statement of the issue treats all of the six progress payments as made under essentially identical circumstances. While defend-

ant suggests differing treatment is sounder, this approach suffices for present purposes.

isfactory, and plaintiff was, or should have been, aware of that view. Plaintiff did not, then or at any time thereafter relevant here, ask defendant to declare Grenco in default, or to terminate its right to proceed.

The Tullahoma project was not an insignificant one. Indeed, plaintiff, itself later alluded to the obvious importance of the project to defendant, and to the apparent urgency that there be no interruption in the progress of the work. When defendant's representatives in charge of the project became embroiled in the dispute between Grenco and plaintiff, they promptly sought instructions with respect to disposition of the progress payment.

The process of decision, which commenced May 25, 1961, with the request for instructions alluded to above, took some 2 weeks. During that period defendant was aware that work on the project had come to a virtual standstill, and there is clear indication in the record that absent a payment by defendant to Grenco it would shut the job down in a day or two at most. Grenco was simultaneously accusing defendant of breach of contract, and the accusation was plainly not without force. *Argonaut Ins. Co. v. United States, supra,* 434 F.2d at 1366–67, 193 Ct.Cl. at 492; *Fireman's Fund Ins. Co. v. United States, supra,* 362 F.Supp. at 846. As the court said in the latter case,

> It is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract. The government cannot lightly withhold funds the contractor may need for this purpose.

In defendant's view, the crux of the problem of lagging job progress was the failure of Oman to continue excavation work on the project. During the process of decision, defendant was told that Grenco had made arrangements to get its subcontractors back to work, and Oman in fact did return to work on the Tullahoma project shortly after June 7, 1961.[11]

Even where defendant knows that a government contractor has serious financial difficulties, defendant does not become obligated either to withhold progress payments or to declare the contractor in default at the surety's request—and no such request was made here—so long as the progress of the contractor on the job is satisfactory to defendant and it has good reason to believe that the contract will be completed. *United States Fidelity & Guar. Co. v. United States, supra; Argonaut Ins. Co. v. United States, supra; United States v. Continental Cas. Co., supra,* 346 F.Supp. at 1244. The record reflects no valid basis for a conclusion by defendant in early June 1961, that Grenco could not complete the project, and Grenco in fact did make substantial progress toward completion of the work for a considerable period of time thereafter.

Despite plaintiff's argument to the contrary, defendant also considered the fact that Grenco's bid had been far less than that of the next lowest bidder, and that excess costs on readvertisement would, for that reason alone, be considerable. Since plaintiff was Grenco's performance bond surety as well as its payment bond surety, consideration of this element was appropriate, if not essential. " * * * [I]t is superior policy, as far as the Government's interest in the cheapest and most rapid completion of the contract is concerned, to keep the original contractor going as long as possible, even when he encounters financial difficulty." *United States v. Continental Cas. Co., supra.* And, defendant's and plaintiff's interests in performance coincided to a considerable degree.

During the process of decision, throughout which defendant did withhold the first progress payment here in suit, it also considered withholding all progress payments until plaintiff and Grenco could reach agreement on check

11. Following June 7, 1961, Grenco paid Oman some, and probably all, of its claim.

delivery, or until the dispute between them could be resolved by legal action.[12] Defendant in fact made some effort, if not a vigorous one, to have Grenco and plaintiff, both located in New York, resolve their differences themselves. In view of Grenco's assertion of a breach of contract by defendant, and plaintiff's advice that no agreement could be reached with Grenco, the possibility of resolution of plaintiff's and Grenco's dispute by mutual agreement was obviously not a viable one, and, even with hindsight, government-initiated litigation appears to be no better solution.

As plaintiff asserts, defendant's telegraphic communications during the period June 1–7, 1961, do contain statements to the effect that, absent a valid assignment by Grenco to plaintiff, the first of the several progress payment checks here in suit should be delivered to Grenco. As the foregoing recitation of facts demonstrates, however, plaintiff's argument that defendant therefore considered *only* whether or not it should recognize the "assignment" to plaintiff not only does not follow, but is patently unsound. While explication of defendant's reasons for the decision would clearly have been preferable, plaintiff's charge of no exercise of discretion at all must be, and is, rejected. See *Andrade v. United States,* 485 F.2d 660, 665, 202 Ct.Cl. 988, 998 (1973); *Grover v. United States,* 200 Ct.Cl. 337, 344 (1973).

What emerges from the record, on analysis, is not a governmental decision reached in the absence of any exercise of discretion and solely on the basis of a determination whether or not plaintiff had a valid assignment, within the meaning of 31 U.S.C. § 203, from Grenco, but rather a careful consideration of a significant number of factors related both to defendant's interest in the timely and efficient completion of the contract work and to plaintiff's interests as surety.

It should be noted, however, that the course of action pursued by both defendant and by plaintiff in this case should not serve as any model for the resolution of future disputes between a surety and the government with respect to progress payments due a contractor in difficulty, and that there are some puzzling, and troublesome, gaps in the record.

Defendant's failure of explication of reasons for its decision to pay Grenco directly has been alluded to hereinabove. The findings fail to indicate that defendant, with knowledge in June 1961 of Grenco's problems, obtained or even sought from Grenco any commitment, formal or otherwise, with respect to the application of progress payments to the Tullahoma project, nor did defendant, at any time here relevant, meet jointly with plaintiff and Grenco in an effort to resolve the impasse in which it found itself.

Plaintiff's actions and inactions are also difficult to understand. Although plaintiff had come to the conclusion, by May 23, 1961, that defendant would make payments directly to Grenco, the findings reflect no effort whatever on plaintiff's part thereafter to obtain from Grenco any commitment with respect to the application of progress payments to the Tullahoma project. Nor, at any time here relevant, did plaintiff initiate any action against Grenco to enforce plaintiff's considerable rights under Grenco's agreement of indemnity with plaintiff.

Indeed, the absence of any meaningful communications between plaintiff and Grenco during the period May 25–June 7, 1961, and thereafter, is striking. *Cf.* Brady, *Bonds on Federal Government Construction Contracts: The Surety's View,* 46 N.Y.U.L.Rev. 262, 278–79 (1971). And, for the period June 8, 1961 to August 31 or September 1, 1961, when the last of the progress payments here in suit was probably made, the findings contain no evidence of any real concern by plaintiff as to Grenco's progress on the Tullahoma project. Throughout the

12. In March 1961 plaintiff had threatened, but did not then or thereafter initiate, action against Grenco.

latter period plaintiff simply waited to see what developed, so far as the record shows.

■ Be the foregoing matters as they may, proof in this case has now been closed on two separate occasions, and it must be decided on the basis of the evidence of record. While the issue is close, and while any resolution of it could not fairly be described as free of doubt, it is concluded that in the light of all the facts and circumstances plaintiff has proven neither an arbitrary and capricious disregard by defendant of plaintiff's equitable rights as surety, nor an abuse by defendant of its discretion.

## IV.

### The Parties' Other Contentions

Plaintiff also contends, among other things, as it did before the court in 1972, that Grenco was, to defendant's knowledge, in default of both its performance and payment bond obligations on May 11 and June 7, 1961; that, there being "default under the contract when there is default under the bond", Grenco was also in breach of its contract with defendant; that, upon Grenco's default, plaintiff acquired well-recognized rights in the funds held by defendant; and that plaintiff had a classic, irrevocable "power coupled with interest".

Defendant, in turn, also reiterates, albeit in expanded form, arguments it made to the court in 1972: laches, estoppel, waiver, ratification, accord and satisfaction. Too, in recognition of the equitable nature of the rights plaintiff asserts, defendant vigorously urges that plaintiff's failure to take any action whatever in the nature of self-help (e. g.,

an action *quia timet* [13] to compel correct conduct by Grenco) should lead to denial of any recovery herein.

To the extent the foregoing contentions have heretofore been urged upon the court, they have, by clear implication, been held not dispositive of the rights of either party to this cause. Accordingly, they need not be discussed herein. The sole new matter is defendant's *quia timet* argument. While plaintiff's response (that any attempt to obtain *indemnification* from Grenco would have been futile, and that any relief plaintiff could have obtained from a court would have been identical to that provided in the May 11, 1961 documents) seems weak, it is also unnecessary, in view of the holding hereinabove, to rule on this contention.

## V.

### Conclusion

In all the facts and circumstances of this case, (1) defendant acted in good faith and primarily to promote the continuation of the contract work in making the progress payments to Grenco, and (2) no arbitrary disregard of plaintiff's rights as surety, nor any abuse of defendant's discretion has been proven. Accordingly, plaintiff is not entitled to recover.

## CONCLUSION OF LAW

Upon the findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

---

**13.** See *Western Cas. & Sur. Co. v. Biggs,* 217 F.2d 163 (7th Cir. 1954); Morris, *A Surety Lawyer's Viewpoint,* 2 Pub.Cont.L.J. 79, 82 (1968).