**UNITED STATES of America,**
**Plaintiff,**

v.

**CONTINENTAL CASUALTY COM-**
**PANY, Defendant.**

No. 69 C 2534.

United States District Court,
N. D. Illinois, E. D.

Sept. 1, 1972.

K. R. Siegan, Asst. U. S. Atty., Chicago, Ill., Edward I. Swichar, Trial Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Charles A. Gilmartin, Richard S. Wisner, Stephen M. Hallenbeck, Chicago, Ill., for defendant.

## MEMORANDUM OF DECISION

TONE, District Judge.

This is an action by the United States to enforce a Miller Act performance bond against the defendant surety on a construction contract for modification of a spillway of the Granby Dam in Colorado, upon the default by the contractor and the completion of work by the Government at an excess replacement cost of $76,261.92. The defendant claims in two separate defenses that it is entitled to a set-off of $78,199.10. Of this amount, $71,207.50 was a monthly earned progress payment which the Government paid to the contractor's assignee several months before the formal default and termination of the contract but only a few days after the Government had notice that the contractor was in financial difficulty; and $6,991.60 was a payment of amounts the Goovernment had retained from prior progress payments which it released on the basis of the contracting officer's finding that progress in performance was satisfactory. The issue is whether the Government was under a duty to withhold these payments by reason of the notice received from the surety.

Both parties have moved for summary judgment. It does not follow from this alone that the case should be decided by summary judgment (6 Moore's Federal Practice, ¶ 56.13 (2d ed. 1971), but here it appears to be conceded on both sides that there is no issue as to any material fact, and summary judgment is therefore appropriate. While the facts are undisputed, the inferences and conclusions the court is asked to draw from them are not. A rather full explication of the circumstances is therefore warranted.

The contract was awarded by the Interior Department's Bureau of Reclamation to Gardner Construction Company on June 16, 1964, all work to be completed by May 20, 1965. The estimated contract price was $464,625, and the defendant surety issued its performance and payment bonds, each for approximately half of the contract price. Shortly thereafter, Gardner assigned all monies due him to a Colorado bank. Work proceeded satisfactorily through the summer and fall of 1964. By the end of November, 80 per cent of the work had been performed to the Government's satisfaction, on or ahead of schedule.

On November 24, the contractor advised its creditors (but not its surety or the Government) by letter that it was ceasing operations and shutting down all jobs immediately, and requesting their presence at a meeting on December 2 to discuss the company's problems. The letter suggested that the company would be liquidated. The Granby Dam job in question here was shut down the next day. The Bureau official at the job site was told only that there would be no more work until November 30 or perhaps December 7. On November 30, the same official learned that the contractor was having "a meeting" on December 2, after which more news would be forthcoming.

The circumstances surrounding the shutdown are complicated by three simultaneous events, viz., the arrival of the Thanksgiving Holiday, the onset of increasingly severe winter weather con-

ditions at the job site, and the surfacing of Gardner's financial difficulties. Normal weather conditions at the mountainous site did not permit work beyond mid-November without special "winterizing procedures." Although there is some evidence that the Government expected some work to continue through the winter, the shutdown in late November was considered by the Bureau's engineers at the job site to be reasonable and no cause for alarm.

During the next two weeks, from December 2, until December 15- the same period in which the voucher for the November progress payment in question was being processed through the various levels of Government officialdom—both the defendant surety and the various Government officials involved received confusing and contradictory information about the financial condition of the contractor and his ability and intention to complete the job. On December 3, the defendant received a copy of the contractor's first letter to creditors of November 24 warning of liquidation. On December 4, after an apparently successful meeting of those creditors, the defendant received another communication from the contractor indicating that it was not the contractor's intention to liquidate, that its jobs were shut down because of weather conditions only, and that it intended to complete all its jobs in the spring.

Similarly, the Government officials involved were hearing discordant themes from and about the contractor. On December 3, the resident engineer at the job site was informed that two materialmen had unpaid claims against the contractor. At the same time he discovered that the December 2 meeting had been a meeting of creditors and that the contractor was in financial difficulty and might have to sell some of its equipment. The next day he was told by the contractor's superintendent that the contractor's winter plans were indefinite but that it expected to begin work again on the job in April or May of 1965. In the next few days, the job site was prepared for a winter shutdown, but not a permanent cessation of operations. On December 7, the resident engineer received a copy of the contractor's second communication to its creditors, affirming that it was the intention of the contractor to complete its jobs, and characterizing its difficulties as "a temporary financial bind."

On December 10, the Bureau's contracting officer in Denver, the official in charge of the project and the only official with the authority to stop payment on a voucher or to declare a contractor in default, received a letter from the defendant surety enclosing a copy of the contractor's first letter to creditors (suggesting liquidation) and stating as follows:

"Subsequent to the date of that letter, we have received correspondence from Gardner Construction Company refuting in part and supporting in part their November 24th letter. We are requesting further information from Gardner Construction Company in an effort to resolve the confusion regarding Gardner's intentions. Any information you may be able to furnish us regarding this matter will be appreciated.

"In the meantime, it is our position that all monies payable under this contract should be devoted first to the performance of the contract and the discharge of obligations incurred therein.

"We therefore request that you make no further payments under this contract without first consulting and conferring with us." [1]

This letter was the first information the contracting officer had that Gardner

---

[1]. The correspondence referred to in the surety's letter was Gardner's second letter to creditors. In its optimism it was starkly contrasting in tone to the first.

The defendant did not include a copy of the second letter with its letter to the contracting officer.

was having financial difficulty. The information which the resident engineer at the job site had received had been relayed by him to the Bureau's Project Office at Loveland, Colorado, which exercised more immediate supervision of the project than the contracting officer. That office had not passed that information on to the contracting officer by December 10. On December 8, the day after the resident engineer had received a copy of Gardner's second, more optimistic, letter to its creditors, the Project Office concurred in Gardner's winter shutdown, and engaged in negotiations with Gardner for a revised spring schedule for completion of the work. The Project Office's report of the shutdown reached the Denver office on December 9. When the contracting officer read the defendant's letter on the 10th, he sent it to his chief assistant and asked him to check it out. That official sent the letter to the Project Office and ordered that office to "make no further payments under this contract pending notification from this office (Denver)."

Payments were made through the following procedure. A voucher was prepared and approved at the Project Office in Loveland. It was then sent to the assignee bank, which then directed the Treasury Office in Denver to draw the check. It is obvious, therefore, that the assistant contracting officer's direction to the Project Office "not to make any more payments" referred to future vouchers which would normally be prepared there, and was not a direction to stop payment or in any way to interfere with the November voucher, which had already been prepared and approved at the Project Office by the 8th or 9th of the month and, as had been the case with previous monthly vouchers, by the 10th of the month was either in Denver being processed or had already been paid. Only the contracting officer had authority to stop payment on a voucher or check which had already been prepared.

Neither the contracting officer nor his assistant made any effort to ascertain the status of the November voucher or to stop payment on it. The check was paid on December 15. At the behest of the Bureau's legal adviser, an inquiry was made into the status of the November payment just hours after it was paid, but no attempt to stop payment on the draft was made by the contracting officer.

On December 18, the contracting officer wrote a letter of inquiry to Gardner which said in part:

"Your recent actions under this contract and other information coming to my attention have caused some confusion in my mind as to your intentions regarding completion of work under this contract.

"    .    .    .    information has been brought to my attention which indicates that you recently called a meeting of your creditors to discuss the 'liquidation' of your company. In view of your apparent change of plan concerning winter construction, this information raises a question in my mind as to your plans regarding completion of work under this contract.

"Accordingly, you are requested to advise me whether the information I have received concerning the 'liquidation' of your company is correct and of your plans for completing the remaining work under this contract."

A meeting was held on January 7, 1965 in response to this letter. Gardner explained that his company had indeed had financial difficulties but that he hoped to resolve them by the end of March, at which time he would furnish plans for completion of the job. On March 30, Gardner did not reply to the Bureau's further letter and telegram of inquiry and, on April 26, 1965, the contracting officer terminated Gardner's right to proceed under the contract and declared him in default. The work was subsequently completed by another contractor.

The law concerning the discretion of the Government to pay an earned progress payment to a contractor in financial

difficulty or to its assignee has recently been clarified by the Court of Claims in Argonaut Insurance Co. v. United States, 434 F.2d 1362, 193 Ct.Cl. 483 (1970). There a surety sought to recover, in addition to the final contract payment, a part of a progress payment made during performance to the contractor's assignee. Both the surety and the Government were well aware of the contractor's financial difficulty for many months prior to the surety's request that the Government withhold all payments to the contractor without the surety's consent. The Government refused to withhold the progress payment in question and refused to declare the contractor in default despite its many unpaid bills "after showing plaintiff [surety] performance charts which indicated [that the contractor] had performed on schedule, and appeared capable of completing the project within the time specified in the contract." 434 F.2d at 1366.

The Court of Claims concluded that the Government has discretion to make progress payments to a contractor in financial difficulty or his assignee as long as it follows its own procurement regulation, 41 C.F.R. § 1–30.521 (1966), by obtaining and analyzing full information concerning the progress of the contractor under the contract involved and his general financial condition "at frequent intervals," and by considering the surety's interest in possible subrogation rights in the event of the contractor's default as well as the interests of the Government in the timely and efficient completion of the work. But the Court's discussion clearly suggests that the Government's interest in the completion of the job is entitled to far more weight than the potential loss to the surety of a fund out of which to satisfy its subrogation claim if the contractor defaults. The strength of this interest is in essence the rationale for the distinction between the Government's discretion to make a *progress* payment *during* performance and its far more limited discretion to make a *final* payment *after* performance.

"During performance, the Government's role is substantially different from that of a mere stakeholder of a final contract payment. The defendant has an important interest in the timely and efficient completion of the contract work. In furtherance of this interest, the Government contracts for a broad range of rights which are designed to promote continuation of the contract work. These provisions give the Government considerable discretion and flexibility in administering the contract. Public policy supports this flexibility in light of the various unforeseen circumstances which may hinder performance." 434 F.2d at 1367–1368.

Other interests of the Government which are entitled to weight in fashioning a rule of discretion allowing the Government to make a progress payment in the face of a demand by a surety not to pay are the retention of economic control by the Government over the decisions to terminate and to complete the contract, the avoidance by the Government of disputes between the contractor and the surety during performance of the contract, and the avoidance of suit by the contractor against the Government for failure to make timely progress payments. *Argonaut, supra,* 434 F.2d 1362, 1367 (1970).

It is true that the Court of Claims in *Argonaut* based its holding on the facts of that particular case, and that the factual context differs in the instant case in several important respects. Nevertheless, under the circumstances here the Government cannot be said to have abused its discretion so as to entitle the surety to a setoff under the *Argonaut* rationale.

■ Here as in *Argonaut,* the contractor's performance on the job had been satisfactory at the time the Government was informed by the surety that the contractor might be in financial difficulty. Despite the unexpected winter shutdown in late November, the evidence clearly shows that the Bureau's

engineer at the job site concurred in the shutdown, thinking that it was reasonable in view of the weather and presenting little reason to believe that the contractor would not be able to complete the job. Assuming that the awareness of two unpaid claims against the contractor are to be attributed to the contracting officer because it was known by subordinate Bureau officials at the time the check was paid, the teaching in *Argonaut* is that such knowledge does not impose upon the Government a duty to withhold a progress payment upon request of the surety. There, the contractor had many unpaid claims, and his financial difficulties were well known, but the Government did not thereby become obligated either to withhold payment or to declare the contractor in default at the whim of the surety—as long as his progress on the job was satisfactory to the Government and the Government still had good reason to believe that the contract would be completed.

The defendant tries strenuously to distinguish the *Argonaut* case. It properly points out that the Court of Claims there mentioned two factors which are not present here; *viz.*, that the assignee bank to which the Government made the progress payment placed it in a trust account for the contractor's costs of continued performance, rather than merely crediting it against the contractor's general indebtedness, and that the Government had in its possession at the time it decided to pay the progress voucher a report from another contractor indicating that he could not complete the contract as quickly or as cheaply as the original contractor.

But these factors are of relatively little moment. The *Argonaut* court mentioned the trust account arrangement because it gave the Government reasonable assurance that the money would be spent to enable the contractor to continue his performance on the contract, 434 F.2d at 1369. But the whole history of the Assignment of Claims Act suggests that the reason for an assignment of payments due a contractor to a bank is usually to make possible the contractor's receipt of credit to finance its operations and complete performance on its jobs. *See* American Fidelity Co. v. National City Bank of Evansville, 105 U.S. App.D.C. 312, 266 F.2d 910, 915–916 (1959). Whether or not the assignee bank funnels the payments directly to the job or indirectly to the satisfaction of the contractor's obligations may be a factor, but it cannot be a controlling one. Similarly, the report referred to in *Argonaut* only confirmed the general experience of the Bureau officials whose depositions were taken in this case that it is superior policy, as far as the Government's interest in the cheapest and most rapid completion of the contract is concerned, to keep the original contractor going as long as possible, even when he encounters financial difficulty.

The facts relied upon by the court in *Argonaut* all bear on the Government's knowledge of the prospects for prompt and satisfactory completion of the work under the contract by the contractor. The defendant's contention here is that the Government's knowledge of two unpaid claims, of the work suspension and of the surety's letter to the contracting officer was sufficient to require the Government, without further investigation, to conclude that the prospects for completion of the job by Gardner were no longer good, to declare that the contractor was in *"de facto* default" and to withhold its progress payment.

■ Neither the Government's procurement regulations nor the applicable case law imposes such a duty upon the Government. 41 C.F.R. § 1–30.521 requires the Government to obtain and analyze information on the contractor's progress and financial condition "at frequent intervals" when it discovers that a contractor is in financial difficulty, but it does not suggest that the Government must immediately stop a progress payment for work already performed upon the first communication from the surety warning that the contractor is in a financial bind. Nor does the Government

have to make a speedy decision of this sort before it has had a reasonable opportunity to investigate on its own as to whether the surety's assertions are well founded.

The defendant contends that when the contracting officer received the surety's letter of December 10, he was obligated to immediately stop payment on the November voucher. It contends that he need not have been concerned about subjecting the Government to a breach of contract action by the contractor because other officials in the Bureau knew that the contractor had two unpaid claims lodged against it by materialmen on the job; and because the surety's bonds are incorporated into the contract with the Government, the contractor was technically in default already. But whether or not the unpaid claims are enough to constitute a technical default is not the issue. The *Argonaut* case makes it clear that an act of default is not enough to impose upon the Government the duty either to declare the contractor in default or to withhold an earned progress payment from his assignee merely at the request or demand to the surety when the Government at the time had reason to believe that the contractor would complete performance. Had the surety asked the Government to declare the contractor in default on December 10 or December 15 and to terminate the contractor's right to proceed under the contract, the Government would have been entitled to refuse to do so, as *Argonaut* clearly demonstrates. Despite the fact that the information in the surety's letter that Gardner was in financial difficulty and might undergo reorganization or liquidation was accurate, the Government was under no duty either to declare an immediate default or to withhold or stop payment, so long as it took reasonable steps to determine for itself whether Gardner had the capacity and the intention to complete the job. In *Argonaut,* the contractor was in deep financial trouble throughout the last months of performance and went into bankruptcy one week after completion of the contract, and yet the court found no duty on the Government to declare the contractor in default. In the instant case, the letter from the defendant surety cannot be considered clear notice to the Government of the contractor's impending doom; nor did it contain any convincing indication of Gardner's inability to complete the contract. Despite the fact that the surety failed to send to the Government the more optimistic second Gardner letter to creditors, the text of the surety's letter was ambiguous enough to warrant the Government in refusing to take the immediate and drastic action of stopping payment on a voucher which had already been prepared or a draft which had already been paid. Under the circumstances, the contracting officer acted reasonably in ordering his subordinates not to process any future vouchers, inquiring by letter on December 18 for clarification from Gardner, meeting with Gardner's officers in January, and finally when it became clear that no performance would be forthcoming, declaring the contractor in default in April.

For additional authority that the Government is under no duty to act with extraordinary speed to stop payment of an earned progress payment on facts very similar to those here, see National Union Fire Insurance Company of Pittsburgh, Pa. v. United States, 304 F.2d 465, 157 Ct.Cl. 696 (1962). There the surety mailed a letter to the Government requesting that progress payments be paid only to itself, in view of the contractor's financial condition. The contractor, who was in financial difficulty, was behind schedule on his Government contract but was still performing and had completed 60 per cent of the work. The letter arrived on the same day that the Government mailed the check for the progress payment to the contractor's assignee bank. This was the first notice the Government had received of the contractor's difficulty. The next day the surety telephoned and asked the Government to stop payment on the check. The

Government refused. Two weeks later work stopped and shortly thereafter the contractor was declared in default. The Court of Claims held that the Government had no duty to stop the check, noting that at the time the work was performed for which the progress payment in issue was made the contractor was not in default. Nor, said the court, was the contractor in default at the time the check was mailed, although the work was proceeding behind schedule. Thus, when the Government mailed the check to the bank there was no valid reason why the Government should not have made a progress payment. 304 F.2d at 467–468. The court thus refused to attribute to the Government a responsibility to act with extraordinary speed to verify newly-obtained information and stop payment. As far as the Government was concerned, the contractor was still performing the contract, and therefore its assignee had a right to collect an earned progress payment while the Government took reasonable steps to obtain information on the contractor's financial condition and to act accordingly to make satisfactory performance of the contract more certain. The time to consider the surety's potential equitable interest in payments to the contractor or his assignee is *after* the Government has had a reasonable opportunity to verify rumors or other information it has received about the contractor, not before. Only when it has had some chance to investigate can the Government exercise its discretion responsibly and protect, to the extent it can, both its substantial interest in completion of the work and the surety's subrogation rights.

■ What has been said here concerning a monthly earned progress payment is equally applicable to the $6,991.-60 payment of retainage from prior progress payments in excess of five per cent of the contract price. Clause 7(c) of the General Provisions of the construction contract in question provides that the Government shall withhold 10 per cent of each progress payment until 50 per cent of the work has been completed, after which, if he finds that satisfactory progress is being made, the contracting officer "may authorize any of the remaining progress payments to be made in full." The Bureau of Land Reclamation has consistently interpreted this provision to mean that it can release all retainage in excess of five per cent (10 per cent of 50 per cent) of the contract price if progress is satisfactory. Gardner asked the Government to release the excess retainage on November 14, when it had completed almost 80 per cent of the work. At that time progress was satisfactory. The defendant's contention that Clause 7(c) authorizes the Government to release the retainage only on future payments, and not to make adjustments on all payments in excess of 50 per cent completion, is a strained interpretation of that provision. The Government was authorized to release the full $6,991.60 retainage in excess of five per cent of the contract price. Furthermore, the Government is under no greater legal obligation to hold up retainage adjustments for work already performed in excess of 50 per cent completion than it is to hold up the monthly earned progress payment. The Government still retains five per cent of the contract price to protect its interest in the completion and acceptance of the work.

The undisputed facts in the instant case fall within the rule of *Argonaut* and *National Union Fire Insurance Company*. At the time it paid Gardner's bank, there was no valid reason why the Government should not have made the payment. The defendant-surety's claim to a set-off in the amount of the progress payment must therefore fail. The plaintiff-Government's motion for summary judgment in the amount of $76,261.92 is granted and the defendant's cross motion for summary judgment is denied.