In re GLOVER CONSTRUCTION CO.,
INC. Glover Contracting Co.,
Inc., Debtor.

AMERICAN STATES INSURANCE
CO., Plaintiff,

v.

GLOVER CONSTRUCTION CO., INC.
United States of America,
Defendants.

and

AMERICAN STATES INSURANCE
CO., Plaintiff,

v.

GLOVER CONTRACTING CO., INC. City
of New Castle, Indiana, Defendants.

Bankruptcy Nos. 48200456, 48200457.
Adv. Nos. 4820095, 4820096.

United States Bankruptcy Court,
W.D. Kentucky.

May 18, 1983.

On Motion to Modify Judgment
June 15, 1983.

William D. Grubbs and Thomas A. Hoy, Louisville, Ky., for plaintiff.

David T. Gray, Asst. U.S. Atty., Lexington, Ky., and to David L. Copenhaver, New Castle, Ind., counsel for the City of New Castle, Ind.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

This matter is before the Court on motion of the plaintiff, American States Insurance Co. (American States), for partial summary judgment in two related adversary proceedings involving Glover Contracting Co., Inc. and Glover Construction Co., Inc. (Glover).[1] American States seeks a declaratory judgment regarding "rights in and disposition of proceeds and progress payments earned and to be earned under the contract by and between the Owner and the Debtor for the construction of centralized tank wash facilities and a lagoon and pump station." [2]

Preliminarily we note that we have jurisdiction to provide the relief sought. Section 213 of the Bankruptcy Code amended 28 U.S.C. § 451 to include bankruptcy courts within the term "court of the United States;" therefore, we may "declare the rights and other legal relations of any interested party seeking such declaration ..." under authorization of 28 U.S.C. § 2201. The declaratory judgment action properly lies here. Indeed, under our District Court Emergency Rule of December 22, 1982, broadly delegating its authority in all bankruptcy proceedings, we cannot escape it.

The nature of American States' claim must be briefly highlighted at the outset. The claimant asserts ownership of the progress payments based upon an equitable subrogation theory. That is, as surety for the construction projects, it alleges an equitable right to payments due the contractor under the contract, to the extent of net costs.[3] Functioning as a court of equity, we must decide the validity of a demand which is not contractual in nature, but rather is purely equitable. In the course of our deliberations we may not, of course, disregard the legal and equitable rights of others to the funds in dispute.

The ultimate issue is whether Glover, as general contractor, has any legal or equitable interest in the progress payments under the construction contract so that they become property of the bankrupt estate under

1. Both Glover Construction Co., Inc. and Glover Contracting Co., Inc., are Kentucky corporations with Robert and Evelyn Glover as sole stockholders. "Construction" was originally incorporated in 1966 by Robert Glover's father, but within six months Robert was the major stockholder, and within eighteen months it had only two stockholders. "Contracting" was formed in 1968 as a sole proprietorship to facilitate business in Indiana without the expense of a 2% gross income tax imposed by that state on corporations. In 1978 the proprietorship incorporated under Sub-Chapter S to continue business in Indiana as a corporate entity. The corporations share a joint bank account and a single line of credit, with inter-company account transfers made to recognize dealings between the two corporations. Both "Construction" and "Contracting" also utilize the same surety, American States, and have done so since July 1, 1977.

2. Plaintiff's Brief, p. 1. We will resolve the question within the delimited framework of the Complaint and the present motion. It is, however, interesting to note that, after much argument and briefing by counsel, American States maintains in its Reply Brief that "(it) has never sought control over disbursement of contract proceeds ... (and that it seeks) ... adequate control of the Debtor by this Court so that contract proceeds go first to contract claims, not to claims of other creditors or to other expenses of the Debtor." (Reply Brief, p. 5.)

3. American States takes the position that it has a property interest in the progress payments which arises from three different sources: (1) the equitable right of recoupment permits reimbursement for claims previously paid; (2) the equitable right of exoneration permits payment for absolute claims prior to actual payment; (3) the equitable right of relief quia timet permits control over the application of contract funds to claims which may be incurred in the future.

§ 541. This determination generates several related inquiries: (1) Is there a significant difference between progress payments and retainage fees so that these funds should be treated differently? (2) Which parties have a property interest in the progress payments and to what extent? ·(3) Are the progress payments simply a trust fund being held for materialmen and subcontractors? Before we embark on an exploration of those questions, an overview of the factual setting is necessary.

\* \* \* \* \* \*

In August, 1981, Glover was awarded two major construction contracts: one with the City of New Castle, Indiana, to build a new lagoon and pump station for sewage treatment (Contracting); and, one with the United States Government to build a tank wash rack facility at Ft. Knox, Kentucky (Construction). The contract prices on these two projects were $2,989,250.00 and $6,279,250.00 respectively. The performance and payment bonds required for each undertaking were executed with American States.

These two construction projects, like all others, may be viewed in terms of a time line, with the beginning and ending points arbitrarily determined by the contract, and performance plotted along that line. In the construction trades, progress along the time line is expressed in terms of "percentage of completion," with periodic payments or "construction draws" received by the general contractor, so that funding and physical improvements run apace. In that rarest and best of all possible worlds, the job is paid out exactly upon completion. When this Court initially encountered this contractor-debtor, it was at mid-point on the Kentucky job, and just beyond the three-quarter mark in Indiana.[4] With its election to file for reorganization relief, Glover assumed the status of debtor in possession

and took on the responsibility of continuing work on both projects. Work at the job sites has been uninterrupted, but is predictably slower because numerous subcontractors and suppliers remain unpaid and are unwilling to contribute further effort. Now, both disputants, American States and Glover, are seeking the same goal, efficient and effective movement toward the September, 1983, completion deadlines.

Disposition of the progress payments on both contracts quickly became a contested issue when Glover applied for authority to borrow funds to meet its current obligations and petitioned this Court to direct the City of New Castle to release payments due and payable to the contractor. Realistically, these progress payments are the only available means for Glover to maintain satisfactory progress and finish on time. Not surprisingly, American States, facing surety liability on both projects, objected to Glover's motions and instituted the present proceedings, all on the same grounds.

Specifically, this surety seeks a declaration that it is the owner of, and entitled to control disbursement of, the funds. American States contends that the general contractor has no property interest in these payments, or alternatively, that it, American States, has a prior and superior property right to such interest as Glover may have.

\* \* \* \* \* \*

Exactly what are these sought after progress payments? Knowing the nature and function of these monies will assist us in determining who has what right vis-a-vis this property. Progress payments are those funds which the owner contracts to pay periodically based upon satisfactory performance.[5] This compensation enables the contractor to embark on costly and lengthy projects without himself financing the en-

---

4. In October, 1982, Glover reported to the Board of Directors that both corporations were insolvent and behind in payments to subcontractors and suppliers. On November 10, 1982, both corporate entities filed Chapter 11 petitions, listing unpaid subcontractors and suppliers on these projects among their creditors.

5. The construction contract will specify a certain percentage of each periodic payment to be withheld and retained until the work is finished, thereby creating the retainage fund.

terprise. Pragmatically, the construction industry and the world of finance have devised a system in which obstacles notwithstanding, the contractor keeps working and the owner keeps paying. Disbursal of progress payments is frequently made despite knowledge of a contractor's financial difficulties. The Supreme Court in *Fireman's Fund Insurance Co. v. United States,* 362 F.Supp. 842, 846 (1973), recognized this widespread practice: "It is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract."

The specifics of the Glover-New Castle agreement provide for monthly installments equal to 90% of the value of the work completed and materials stored on site. At Ft. Knox, the United States issues funds to Glover after its demand is evaluated in terms of the percent of work finished. In both cases there is, in the background, a governmental entity contractually bound to pay Glover [6] and vitally interested in a continuation of the work and its timely completion. We deal with this case in that unique context, and realize that any amounts which Glover may draw in the future are extremely uncertain because they are dependent on actual performance as measured by rigid governmental requirements. Because work is still in progress, overhead and operating costs are mounting, and potential subcontractor claims are being generated, presently incalculable as to ultimate amount and claimant identity.

American States recognizes this element of uncertainty in its claim, but nevertheless insists that it is the true owner of the contract proceeds. In our estimation, American States understates its vulnerability with the observation that "other claims will arise in the future during the completion of the Contract." (Plaintiff's Complaints, p. 5). The contractor's expenses

and the secondary parties to be reimbursed remain unknown variables, even as we are asked to decide the practicalities of satisfying these costs. But for the meantime the surety jealously stakes out the proceeds, without knowing the full scope of its exposure or to whose demands it may have to answer.

Necessarily, then, the chronological context of this litigation is most salient. We are asked to elucidate the property rights of these parties at approximately the median point along the time line of the Glover jobs, mindful that our resolution will determine the fate of these ongoing projects. Likewise, we are aware that the future of these Chapter 11 debtor-contractors, and the solvency of numerous smaller subcontractors, hang in the balance.

For the reasons we will express herein, we declare that the Glover companies have an undeniable legal and equitable interest in the progress payments, and that those payments are therefore property of the Chapter 11 estate.

In order to reach that result we are required to distinguish away the leading Supreme Court case upon which American States relies, *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The *Pearlman* case involved "a dispute between the trustee in bankruptcy of a government contractor and the contractor's payment and bond surety over which has superior right and title to a *fund withheld* by the Government (the Owner) out of earnings due the contractor." [7] That is not our case. A contract retainage fund is gradually built up through the owner's retention of a percentage of the periodic progress payments. These funds may be, and are always, retained by the owner until the completion and acceptance of the contract. They function as an incentive to completion and as an

---

**6.** The contract between the owner and the contractor must be seen as the underlying basis for the entire series of transactions involved in a successful construction project. The owner is under a contractual obligation to pay the contractor, and the latter has a statutory duty to pay his subcontractors. Indiana statutory law

states this explicitly, while the duty is obviously implied in the federal regulatory scheme. See note 22, infra.

**7.** *Pearlman v. Reliance Insurance Co.,* supra 83 S.Ct. at 233 (emphasis added).

indemnity resource for unpaid subcontractor's claims or guarantor payments of claims of secondary parties. Throughout this opinion we will emphasize that we have here *not* a "retainage case", but a "progress payments case." The distinction is crucial to our result.

Viewed from a time perspective, *Pearlman* presented a comfortable position for adjudication. The matters in dispute were definite and ascertained; the parties and amounts in controversy were known. The facts in issue were matters of history, not future speculation.

In *Pearlman* the bankrupt had sought liquidation under the aegis of the old Bankruptcy Act. The job in question, the St. Lawrence Seaway construction project, had been completed (although by another contractor); the United States had received the benefit of its bargain and had no further interest in the retainages. The contractor's job-related expenses were no longer a consideration; overhead and operating costs had terminated. The amount of the retainage fund, and the extent of the surety's claim for bills it had paid pursuant to its bond were known factors: $87,737.35 and $350,000.00 respectively.

Only the final settlement of accounts remained as the Supreme Court decided whether the surety had ownership of an equitable lien on or a prior right to the fund before bankruptcy. Under these circumstances, Justice Black noted that the retainage funds would have been due to be paid to the contractor had it paid its subcontractors, but that now the surety has a right to all of the remaining fund as reimbursement.[8]

Thus, in the retainage fund situation, the Supreme Court was called upon to make a retrospective determination of property rights, and thereby carve up a well defined pie into appropriate size portions. We are not asked to replicate *Pearlman* and adjudicate the respective rights of competing claimants to a sum certain. Rather, we

have been asked to construct and apply a more complex judicial quotient: to formulate a *prospective* clarification of the rights of contractors and sureties to the owner's interim payments on two unfinished public projects. Bluntly put, Glover and *Pearlman* are of different breeds.

Neither is this case similar to *In re D & B Electric*,[9] previously decided by this Court. Our task there was to resolve the priority of liens in the context of liquidation proceedings under Chapter VII of the prior Bankruptcy Act. Like the *Pearlman* court, we had the luxury of making a purely retrospective determination. As a result, we could identify and apply known, definite factors in aligning the unpaid supplier and the trustee in bankruptcy vis-a-vis property that was the functional equivalent of retained funds.

We had a certain minimum amount of hard data to assist us in *D & B Electric*. Rueff Lighting Co. had ceased making deliveries on the two jobs where D & B Electric was the subcontractor, and claimed $5,494.97 was owed. This supplier had taken a further step in establishing its entitlement to the disputed amount, by obtaining checks from the respective general contractors. The checks had been made jointly payable to Rueff and D & B Electric, and remained in Rueff's possession, unendorsed, as potential assets of the estate, when D & B Electric filed bankruptcy.

This Court then dealt with a previously drawn, jointly payable check, with its payees as contestants for the ready money. We realized that the subcontractor-supplier relationship necessarily involved an equivalent exchange: Rueff was to deliver fixtures to D & B Electric in return for payments. One contestant, the supplier, remained unpaid although he had completed performance of the service promised. Obstensibly the checks were executed in satisfaction of the underlying claim. Under these circumstances, where one party had yet to receive the benefit of his bargain, we

8. *Pearlman*, supra 83 S.Ct. at p. 237.

9. *In re D & B Electric, Inc.*, 4 B.R. 263 (Bkrtcy. W.D.Ky.1980).

were able to "shift the balance of equities" [10] through an interpretation of the state statute regulating contractors. Our determination was guided by two recent decisions of our circuit court outlining the fundamental reasons for treating contractor monies as a trust fund held for the benefit of materialmen claimants.[11]

The conclusion reached in *D & B Electric* was that a subcontractor had no property rights in money paid by the general contractor after completion of services to satisfy a supplier's claim.[12] We reasoned that "Rueff is the beneficiary of a trust administered by the general contractor ..." [13] However, that finding was based on a set of circumstances wholly unlike the Glover-American States impasse.

Our analysis of KRS 376.070 revealed that it addressed the legal obligations of three parties—the owner, the contractor, and any person furnishing material or performing labor on the property. The owner is contractually bound to pay the contractor for performance rendered, and he, in turn, is statutorily required to pay those who make the construction possible. As we read the statute, the presence of an intermediary (the subcontractor), did not eliminate the underlying contractor-supplier linkage. Perceiving this basic connection, we reached the conclusion noted above through trust theory.

However, holding that a subcontractor has no rights to certain funds held by the general contractor offers no enlightenment on the totally distinct question of what the general contractor's rights may be in monies held by the owner. Although we recognized the beneficiary status of the supplier, we made no pronouncements regarding the contractor's interests.

Today we try to dispel the distress within another tripartite relationship—owner, general contractor, and surety. In *D & B Electric* we untangled the legal rights among a general contractor, a subcontractor, and a supplier. But neither case impacts on the other; both the parties involved and the issues at stake are different.[14]

While trust theory may favor a supplier under state lien law, it has no meaning for the question of whether a surety may displace a general contractor's interest in progress payments due or to become due on an uncompleted job.

The *Pearlman* rule of law in the post-job, retainage situation recognized the equitable claim of a surety and an unpaid supplier to the exclusion of the contractor. That basic principle was developed not only in a different fact context but under the Bankruptcy Act, while we must operate here according to the framework of the new Bankruptcy Code with its remarkably broadened definition of "property of the estate." [15]

Additionally, upon comparison, the issues and interests pertinent to funds retained for disbursement after acceptance of a completed project, and the successive payments made to the contractor to facilitate performance, appear radically dissimilar. The telling considerations in a liquidation proceeding are not determinative when the relief sought is reorganization of an ongoing business. We therefore reject the legal principles of *Pearlman* and *D & B Electric* as inapplicable to the facts of this case.

\*      \*      \*      \*      \*      \*

10.  *Id.* p. 268.

11.  *Selby v. Ford Motor Co. et al.,* 590 F.2d 642 (6th Cir.1979); *Parker v. Klochko Equipment Rental Co., Inc.,* 590 F.2d 649 (6th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979).

12.  *D & B Electric,* supra, 4 B.R. at p. 268.

13.  Id. 4 B.R. p. 270.

14.  Our decision in *D & B Electric* involved an interpretation of Kentucky law. Neither Glover project relies on Kentucky law to define the contractor's interests in the progress payment. Rather, Indiana law and the Miller Act are relevant in this litigation.

15.  We had occasion to extensively consider the § 541 definition of "property of the estate" in *In re Hurricane Elkhorn Coal Corp., II,* 19 B.R. 609 (Bkrtcy.W.D.Ky.1982).

■ Focusing only on progress payments, then, we perceive them as latent assets of the bankrupt estate under § 541(a) of the Bankruptcy Code. This Section specifies property that shall comprise the estate, and includes "all legal or equitable interests of the debtor in property." The Code does not attempt to determine whether the debtor has an interest in property, or its nature; nonbankruptcy law must be consulted. However, once the debtor's property is examined and his interests identified and cataloged, anything to which he has a legal or equitable claim becomes part of the § 541 estate.

As we resolve the § 541 inquiry we must keep in mind the critical characteristics of progress payments. They are periodic cash receipts from the owner consequent to an enforceable contract. This method of compensation is given not in exchange for a single simple element of performance, but one having many constituent parts. The owner's money "buys" satisfaction of all aspects of the construction project: the contractor's expertise, the operating overhead inherent in the project, labor expended, and materials used. All of these factors were components of the contract price. Indeed, the owner, in part, pays the contractor a series of lump sums to be relieved of the effort and responsibility of coordinating a myriad of ancillary transactions.

We find no cases considering the application of § 541 to progress payments, as such, in a dispute between a general contractor and the surety. There have been cases decided regarding a related issue, the competing rights of the owner and the surety.[16] Courts dealing with the issue as between those parties have focused on the owner's contractual duty to pay, and have indicated the rights in jeopardy in the treatment of

progress payments: (1) ability to administer the contract; (2) avoiding entanglement in construction disputes; and (3) timely completion at a minimum cost. In this line of cases, it has become settled that absent a showing of bad faith or an abuse of discretion, the owner's payment to a financially troubled contractor will be upheld in the face of a surety challenge. Typical of all the other decisions and consistent with our reasoning in the case at hand, *Continental Casualty* emphasized the critical difference between payments during performance and those made after performance, noting that the owner's discretion over a final payment is much more limited.[17]

This being the state of the law, we treat the question of the respective rights of a contractor and a surety regarding progress payments as one of first impression. Starting with the contractor, we must recognize his contract interest in the payments. By definition, Glover's contractual arrangements with both the City of New Castle and the Army are agreements enforceable at law. There are only two parties privy to the contracts generating this cash, the owner and the contractor. The latter's right, which we acknowledge, is the mirror image of the owner's right that has been sustained in the *Continental Casualty* line of cases.

■ Although contract rights to receive payments are not absolute, the common law pays them considerable deference. In a nonbankruptcy setting, for example, if there is a substantial failure to make progress payments, the contractor may treat this as a material breach of the contract, stop performance, and sue for contract remedies.[18] That is not a problem of this case; both owners, government entities with statutory duties of performance of their own, are willing and eager to pay.

**16.** *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d 622 (Ct.Cl.1982); *Royal Indemnity Co. v. United States,* 529 F.2d 1312, 208 Ct.Cl. 809 (Ct.Cl.1976); *Fireman's Fund Insurance Co. v. United States,* 362 F.Supp. 842 (D.Kan.1973); *United States v. Continental Casualty Co.,* 346 F.Supp. 1239 (N.D.Ill.1972); *Argonaut Insurance Co. v. United States,* 434 F.2d 1362, 193 Ct.Cl. 483 (Ct.Cl.1970).

**17.** *Continental Casualty,* supra 346 F.Supp. at p. 1243.

**18.** *U.S. for Use and Benefit of Micro-King Co. v. Community Science Technology, Inc.,* 574 F.2d 1292 (5th Cir.1978); *U.S. ex rel E.C. Ernst, Inc. v. Curtis T. Bedwell & Sons, Inc.,* 506 F.Supp. 1324 (E.D.Pa.1981).

Nor have the Glover contracts been rejected as burdensome during this reorganization, which the petitioners had a right to do. Against this background we cannot ignore the legal right to receive payment which provides the only funding mechanism for a Chapter 11 plan. Nor can we overlook the underlying equitable interest, with the contractor continuing to perform—at least for the time being—the promised services.

■ In the course of writing this opinion we have been informed by counsel for the plaintiff of a most recent decision of another bankruptcy court that considered the rights of this same surety on a bonded construction project. *In re RAM Construction Co., Inc.*[19] involved an identical setting but different parties in dispute; in that case the contenders for control of the progress payments were the debtor's surety and the debtor's assignee bank, which was a first priority secured party. The Court held that the secured party's claim must yield to the rights of the subcontractors, the surety, and the owners. In *RAM* the fundamental § 541 question was not decided; the Court allowed the surety joint control with the Chapter 11 debtor over project disbursements, to ensure payments of only those expenses necessary to the ongoing contracts. At no point did the court hold that the payments bypassed the bankrupt estate. Rather, it recognized that "RAM's claim to these monies is encumbered...."[20], and

then devised a scheme to enable the debtor to accomplish its attempted reorganization.

There is nothing in *RAM* inconsistent with our holding today that interim construction payments are part of the estate of a general contractor in Chapter 11. In fact, the *RAM* court only announced through formal written opinion the same attitude we have expressed in numerous rulings in open court in the Glover case: that the stream of payments cannot be diverted from the jobs to which they relate. We have consistently ruled, on various motions, that payments must be first applied to those claims on which the surety is or may become liable before the Chapter 11 debtor can be paid the first discretionary dollar.

Certain of American States' alternative positions are well taken; the surety *does* subrogate to the owner's right of recoupment, and it *does* have a right of exoneration by the owner and the debtor for absolute claims. However, American States' argument lacks a crucial theoretical linchpin: Who has the legal interest in the property over which the surety asserts its superior beneficial claim? Nowhere in arguments presented to this Court does American States grapple with this necessary nicety.[21]

If we were to view this property (the progress payments) as a traditional trust,[22] the subcontractors and suppliers would own beneficial title to a portion of the trust fund, and the contractor would hold legal title to those funds as trustee.[23] However,

19. (W.D.Pa. April 15, 1983) (No. 83–135, A.P. Nos. 83–0268, 83–0466).

20. *RAM,* supra at p. 7.

21. Because, we suspect, to admit legal title in Glover would give away the case that the progress payments are not property of the estate.

22. Here we are referring to an express trust created by the parties to the construction contract or to a statutory trust which arises automatically. Because the construction in Ft. Knox involves a federal project the Miller Act is controlling. 40 U.S.C. § 270a et seq. The underlying objective of this legislation presupposes that the contractor has a fiduciary duty towards workers associated with the project. Pursuant to this statute contractors must post performance and payment bonds on public con-

tracts, and the designated class may sue on these bonds. This right is in substitution for a lien on the governmental property. Regarding the lagoon in New Castle, Indiana has statutorily imposed a trustee role upon the contractor by requiring payment of subcontractors from contract funds. See, Burns Indiana Statutes Annotated §§ 36–1–12–12; 36–1–12–13; 5–16–5.5–5. A coincident fiduciary duty was created by the Indemnity Agreement between Glover and American States.

23. Based upon KRS 376.070 we recognized this contractor-supplier trust relationship in *D & B Electric,* discussed earlier, and bypassed the subcontractor's bankruptcy estate, noting that this intermediary party was merely a "conduit" between the contractor and his supplier.

interim construction funds, as we have suggested, do not amenably lend themselves to a simplistic, single-trust analysis. For a segment of each payment, the contractor might also hold beneficial title. Part of each payment might be compensation for expenses exclusive of labor and materials, for the contractor's services and his own necessary business costs. Thus, the contractor may assume both the role of the trustee and beneficiary at times.

When the contractor functions as trustee, he is paid to distribute monies to subcontractors and suppliers. In this capacity, his services include receiving all claims, evaluating them, and paying only those that are valid. It is a basic tenet of trust law that the trustee has a legal interest in the property he holds, which requires its inclusion under § 541(a).

However, the Bankruptcy Code does not overlook the outstanding beneficial interests. According to § 541(d) the property comes into the estate subject to those interests. The estate is vested with all the rights that the debtor had as a trustee, including his right to a servicing fee. If these rights are not valuable, they may be abandoned with the corpus under § 544. Therefore, if regarded as in trust, the progress payments are included within the estate, but with important restrictions imposed.

■ Whether we view the contractor's interest as a legally binding contract interest or as an interest held by him as a trustee, the property will become part of the estate. Furthermore, regardless of the manner of statutory entrance, the treatment of these progress payments during reorganization must be identical. From the § 541(d) vantage point, part of the payments are subject to beneficial interests of subcontractors and suppliers. Any payments received by the contractor which fit into this category would be for the benefit of those persons. Alternatively, if funds are included in recognition of his valid contract interest under § 541(a), the contrac-

tor, as debtor in possession, must still make payments to his subcontractors and suppliers. He is under a fiduciary duty to operate the business in the best interests of the estate.[24]

■ Acknowledging interests in others, while warranted, does not alter our basic § 541 determination. Although we note their existence, we need not now dissect and quantify these correlative interests. Section 541 does not demand exclusivity of interest in the debtor; for example, if he has a shared interest as a life tenant, joint tenant, tenant in common, or lessee, still the property becomes part of the bankruptcy estate. According to the mandate of the statute, whenever the debtor has either a legal or equitable interest in property it is to be available to afford a meaningful opportunity for a fresh start.

This rationale is particularly persuasive in the present context. Progress payments provide the working capital for the construction industry. As noted at the outset, these funds are the only available means of continuing work on the sites, and attaining the completion deadlines. To hold that a bonded contractor's bankrupt estate does not include his operating capital would be to close the Chapter 11 courtroom door to a broad class of claimants for relief.

\*   \*   \*   \*   \*   \*

Our extended deliberations on the "property of the estate" question, and the careful distinctions we have drawn to keep at distance the *Pearlman* precedent and our *D & B Electric* case, have been made necessary by the nature and quality of this declaratory judgment action.

These complaints exemplify full dress, state-of-the-art advocacy. They and the written arguments which follow them proceed from a highly sophisticated strategy—to effectively freeze the only funding source for a Chapter 11 business continuation while the Court is returned to the stacks for an extended review of fundamental precepts, and at the same time to minimize the exposure of surety to what would

24. 11 U.S.C. § 1107.

surely be, in a nonbankruptcy context, a costly duty of performance.

It is precisely the fact that progress payments are linked to performance that sets them apart from retainage funds and makes them "property of the estate." American States seeks unlimited authority over the construction funds but treats the duty of performance with patrician disdain. At no point has it sought to exercise its contractual option to step in and take over the jobs in question, although we have suggested in Court that the surety's most practical method of analyzing its potential exposure would be to periodically determine, from one progress payment to the next, whether Glover can complete the work cheaper than a replacement contractor.[25]

The linkage between performance and payments is one which American States can ignore but we cannot, in order to protect not only the owners, subcontractors and suppliers whose rights the surety derivatively asserts, but their project partner, the contractor Glover.

█ To the extent that the surety is actually seeking "adequate control of the debtor ... so that contract proceeds go first to contract claims," [26] American States is seeking a protection which has already been extended by the Court in a series of interim rulings at every stage of this proceeding.[27] Until such time as it is possible to precisely quantify the ultimate liability of surety,[28] it will be the unrelenting demand of this Court that progress payments be disbursed in the following order:

(1) to bona fide claims against the jobs, for the period in question, concerning which American States may become liable,[29] and

(2) subject to the availability of periodic surplusages, to those items of the contractor's job-related operating and overhead expenses which are ordinary and necessary, most stringently viewed.[30]

### On Motion To Modify Judgment

We entered a declaratory judgment on May 20, 1983, holding that progress payments to be made to a general contractor engaged in two construction jobs while operating under Chapter 11 are "property of the estate" within the meaning of Section 541 of the Bankruptcy Code.

The surety on the jobs, which had unsuccessfully alleged under various equitable theories that its rights to the payments had displaced those of the contractor, now moves for a modification of our earlier judgment. The motion was timely brought.

The motion of American States Insurance Company seeks three ends: (1) a determination that it has a claim of absolute seniority to the retainage being accumulated as the jobs progress; (2) a modification of the

---

**25.** In Chapter 11, of course, the § 362 automatic stay would prevent the replacement of Glover, without prior court approval.

**26.** Reply Brief, page 5.

**27.** These parties were initially ordered to establish a joint checking account for the payment of subcontractor claims. Their inability to reach that limited working arrangement prompted the court, after this declaratory judgment action came under submission, to appoint a trustee for the purpose.

**28.** That there will be liability is now beyond doubt. The combined scheduled retainage is $613,000; American States at this writing already has paid $1,244,000 in claims. Without now deciding the question, it appears that American States will have a *Pearlman*-type claim against most, if not all, of the retainage fund.

**29.** Concerning those claims as to which it is already liable, the subrogated surety may assert its rights to the retainage; see note 28, supra.

**30.** The factors militating in favor of this restrictive view are economy to the estate—always a requirement in Chapter 11—and the limited prospect of a successful reorganization of this debtor. According to financial information made available recently to the Court, both of these jobs are operating at a loss and there are no others. Unless the plan to be submitted to the Court projects some other substantial income potential, the feasibility of a reorganization effort will become a serious question. But for now, feasibility is a question we cannot decide.

priorities of payment established by our May 20 order to include reimbursements to American States for payments already made by it as surety to subcontractor and ·supplier claimants, and (3) a declaration that progress payments are *not* property of the estate *until* American States has been made whole for claims paid by it. The motion also seeks other modifications of our order which are essentially stylistic and editorial in nature.

The first proposed amendment seeks a declaration on matters not before the Court. It would be premature to attempt to establish priorities to a fund of still unknown amount which might be subject to other claims, such as administrative expenses, entitled to seniority by operation of law. However, footnote 28 of our opinion gives a preliminary indication of the strength of American States' claim against the retainage.

The second and third proposed amendments to our judgment seek a substantive modification of the decision. As we recently observed in *Re Hurricane Elkhorn Coal Corp., II,* 20 B.R. 631, 632 (Bkrtcy.W.D.Ky. 1982), "(t)he motion does not seek 'alteration' as that term is understood in practice—such as an amendment of the findings of fact upon which a judgment rests—but rather an absolute reversal of the substantive judgment itself." As in *Huricane Elkhorn, II* (which also was a Sec. 541 case) the motion will be overruled.

On a balanced rereading of our treatment of the "property of the estate" question, we believe it comports well with the expansive view of the concept announced last week by the Supreme Court of the United States in *United States v. Whiting Pools, Inc.,* —— U.S. ——, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

American States also takes exception to our use of the phrase "patrician disdain" in describing its attitude toward the possibility of taking over and completing the jobs in question, and to our comments on the "sophisticated strategy" underlying this declaratory judgment action. We leave it for the appellate function to expunge adjectival excess, to glean dicta from operative holding, and to embrace or reject either or both. In the meanwhile we reserve the literary license that goes with the job.

For the above reasons, the Declaratory Judgment of May 20 and the accompanying Memorandum and Order are hereby ratified and restated in their entirety, and the motion of American States for their amendment is overruled. This is a final and appealable order.