**In re GLOVER CONSTRUCTION CO., INC., Debtor.**

**Bankruptcy No. 48200456.**

United States Bankruptcy Court,
W.D. Kentucky.

Nov. 23, 1983.

John P. Reisz, Louisville, Ky., John S. Smith, Lebanon, Ky., for debtor.

William D. Grubbs, Thomas A. Hoy, Louisville, Ky., for American State Ins. Co.

David T. Gray, Asst. U.S. Atty., Louisville, Ky., for Corps of Engineers.

Charles E. Peyton, Louisville, Ky., trustee.

Tim Truman, Fort Worth, Tex., for Fleetwash Systems, Inc.

Victor B. Maddox, Louisville, Ky., for Westinghouse Elec. Supply.

MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

On November 10, 1982, Glover Construction Co. filed for reorganization under Chapter 11 of the Bankruptcy Code. On that day by operation of law a protective statutory cloak was lowered into place which stayed all creditor actions.[1] On September 8, 1983 American States Insurance Co., surety for this debtor on a bonded public works project, filed a motion which in essence sought the removal of the automatic stay. The motion was the subject of extended hearings on short notice on October 7 through 11. This order follows.

None of these events are unusual or unexpected in proceedings in Chapter 11. The automatic stay of 11 U.S.C. § 362 is applicable to reorganization proceedings to give a reorganizing debtor relief from creditor pressure and an opportunity to restructure. It is not uncommon for a creditor, fearing economic depreciation of its collateral beyond salvage value, to request relief from that stay.

What *is* uncommon about the instant controversy is the nature of the property interest sought to be released from the inhibitory effects of § 362. The unique nature of this claim for relief will become apparent in the course of this opinion.

Section 362(d) was enacted by Congress to remedy the previously inadequate treatment of secured creditors in bankruptcy proceedings. It affords such creditors relief if their interests are detrimentally affected

---

1. 11 U.S.C. § 362.

by the stay. The standards for relief are expressly stated, and relief becomes available thirty days from the request, unless the court holds a hearing and intervenes in favor of the debtor.[2]

■ Although the statutory language is unlimited, the legislative history designates the obvious beneficiaries of § 362; the envisioned "protected class" is comprised of creditors with collateral that may be deteriorating in value.[3] American States is *not* a secured creditor attempting to repossess rapidly depreciating property. Nevertheless, the breadth of statutory language leads us to believe that American States is a proper claimant for relief from § 362.

As we have said, there are certain standards that the movant must meet to escape the automatic stay. Section 362(d)(1), relied upon by American States, demands that there be "cause" to vacate the stay. The moving party must show some interest in property that is jeopardized by continuation of the stay. Certainly, isolation of the interest at stake must precede any consideration of its status during the bankruptcy proceedings. This is especially true when we deal not with the typical secured creditor, but with a contractor's surety.

American States bypasses this threshold consideration and proceeds immediately to the allegedly endangering factors. Its original motion, arguments during the hearing, and supporting briefs contend that the stay should be lifted because Glover's unsatisfactory performance precludes timely completion of the contract. The surety's ultimate complaint is that if Glover is permitted to perform, although at an unsatisfactory rate, its "exposure will increase as the project falls farther behind and the unpaid bills of suppliers and contractors mount."

On the preliminary question—the nature of the property interest sought to be protected—it is unnecessary for American States to argue. It unquestionably has an equitable interest in the contract progress payments.[4]

Somewhat more difficult is an analysis of exactly how the § 362 automatic stay impacts on this property interest, and how its removal would benefit this creditor. We approach the question foreknowing that this equity court must "balance the hurt" between the debtor's right to reorganize and the surety's rights to realize its bargain and to be exposed only to risks actually anticipated and contracted for. Equity must also take cognizance of the other parties which will be materially affected by our determination—the Army Corps of Engineers, which awaits use of the completed facility, and the many subcontractors and suppliers who are financially dependent on this project.

We weigh the following facts:

1. Glover is the general contractor for a tankwash facility at Ft. Knox. The contract price is $6,279,250, and the revised completion date is October 10, 1983, with an additional eight days that may be justifiable according to Corps of Engineers' correspondence. Liquidated damages are allowed at $555/day.

2. Pursuant to the two bonds executed with Glover for this project, American States must pay all unsatisfied claimants and complete performance if Glover fails to finish the work.

---

2. H.Rpt. No. 95–595, 95th Cong. 1st Sess. (1977) 174–5, U.S.Code Cong. & Admin.News 1978, p. 5787.

3. Id. See also 2 *Collier on Bankruptcy* ¶ 362.08 at p. 362–54 (15th Ed.)

4. This threshold inquiry was implicitly resolved in a recent declaratory judgment involving these parties. American States' initial foray against the debtor required us to determine whether progress payments to become due under the construction contract were part of the bankruptcy estate under § 541. We concluded that they were. During that dispute the surety correctly took the position that it had certain equitable rights in the progress payments. Our judgment was *not* that American States was *without* an interest in this property, but rather that the debtor *did have* a "legal or equitable interest" in the property which became part of the bankruptcy estate under § 541. *In Re Glover Construction Co., Inc.*, 30 B.R. 873 (Bkrtcy. W.D.Ky.1983).

3. American States has paid $934,229.52 in *pre-petition* claims.

4. By order of this Court, March 23, 1983, American States was given veto power over disbursement of all construction funds. A specialized trustee was appointed to administer a Glover-American States joint checking account.

5. Because this is a public project, the Corps releases contract funds to Glover based on materials stored on site and actual work in place. These payments facilitate an approximation of the contractor's rate of performance.

6. No funds were authorized or paid to Glover during the period April-July, 1983.

7. Glover and the Corps reached an impasse regarding a phase of the construction by the end of March, 1983. As of April, 1983 the Corps did not have test results indicating that masonry block work was of acceptable standards. Consequently, no masonry work or work built upon it could qualify for progress payments.

8. No work stop order was issued by the Corps, but correspondence to Glover advised that removal of the masonry might be required. On July 19, this problem was resolved, further tests were waived and the Corps advised that it knew "of no reason that the work should not now proceed on the masonry."

9. On July 29, payment for work during March was authorized, $19,619. On August 31, payment for work performed April through July was authorized, $72,891. On September 16, payment for work during August was authorized, $66,675. On September 20, payment for work through September 19 was authorized, $61,639.20. On October 11, payment for work from September 20 through October 5 was authorized, $121,479.

10. The following is a time perspective of the Ft. Knox project:

| Time Period | Payments Received |
|---|---|
| 9/21/81 – 1/8/82 | $1,000,000 (16%) |
| 1/8/82 – 4/15/82 | $1,000,000 (16%) |
| 4/15/82 – 8/1/82 | $1,000,000 (16%) |
| 8/1/82 – 1/1/83 | $1,000,000 (16%) |
| 1/1/83 – 3/31/83 | $ 325,984 (5.19%) |
| 4/1/83 – 8/15/83 | –0– |
| 8/15/83 – 10/11/83 | $ 322,685 (5.138%) |

As of October 11, 1983, $4,647,670 had been earned under the contract, 74.3% of available funds.

11. The Corps has withheld $336,318.80 as a retainage fund.

12. On October 5, 1983 Glover presented a revised schedule and cost of completion to the Corps. That document shows a completion date somewhere between December 15 and 31st, and indicates a total project cost remaining to be $1,753,059.

13. An additional document, presumably Glover's internal working document, was introduced which also showed work to be done and cost to complete as of September 19. It contains a cost estimate to complete of $1,621,650 (as well as $1,690,138).

14. Glover projected a $131,409 profit on this job, based on $1,821,547 available as of September 1, and a cost of completion of $1,690,138.

15. American States did not offer a cost estimate for it to complete the remaining work. It also did not indicate any precise or definite plans regarding the project: retain and monitor Glover, obtain a replacement contractor unilaterally, rebid and relet the contract, winterize the site. The surety's consultant, expert witness, projected a net loss on this job of $1.3 million based on the ratio of funds received and expended and work completed to date.

16. As of October 11, there is $1,631,580 available under the contract. In addition the joint checking account contains a balance of $330,361.27.

17. During the term of the joint account the trustee, with American States' approval, has made disbursements totalling $441,795.71.

18. Glover has several proposed "change orders" pending before the Corps, which may or may not generate additional income and perhaps time extensions for completion.
19. Work on the tankwash facility is currently proceeding apace.

American States has demonstrated that the debtor in possession did not make significant progress on the project for over five months. Nevertheless, this fact alone does not amount to "cause" to lift the stay. A countervailing factor is the current pace of work on the site, and the harm to the debtor if the stay were to be lifted. The harm would be absolute; reorganization would be impossible.

█ We would not hesitate to lift the stay if *it* were the real thorn in the party's side. American States has not shown this to be the case. The stay would be injurious to the surety if *post-petition claims* were being generated; none have been. And, given the testimony at the hearing, we cannot say that it is impossible for the job to be finished within budget. *If* Glover can finish the project with the financial resources available, and not generate *post-petition claims* upon which the surety will become liable, then the stay need not be lifted.

Glover has approximately $1.9 million available ($1,631,580 in undistributed contract funds plus $330,361.27 in the joint account) to complete this job. His cost-of-completion estimates do vary somewhat, but even the higher figure of $1.7 million is within the available income. We give credit to this testimony because of his intimate involvement with this project during the prior two years, and his twenty-plus years of construction experience.

We are not unaware that Glover may well be working entirely on Corps time and incurring liquidated damages each day. With a termination date of December 31, this would amount to $41,070, a significant but nevertheless manageable figure considering the scope of this project. Likewise, we do not ignore the problems with two of the suppliers, but the amount of these disputed claims has not yet been determined. Such indefinite factors do not provide legal basis for vacating the stay.

American States did not offer its own cost completion analysis. Instead, it characterized the job as a losing proposition because of *pre-petition claims* paid under the bond. It may seem harsh to American States, but *pre-petition claims* it has paid are irrelevant in determining whether the stay is permitting Glover to inflict further injury. We repeat that, to date at least, the job has been self-sustaining, *post-petition*.

Mindful that our task is to discern the impact of the stay on the party seeking § 362 relief, we conclude that the legislative protection extended one year ago has not been detrimental to American States. Therefore, its motion to lift the stay is denied.

We do not conclude that American States has not suffered during the life of this construction project. It has had to satisfy $934,229.52 in *pre-petition claims,* but this is not a loss that can be corrected by lifting the § 362 injunction. Through the present motion the surety hopes to avoid any additional expenses while the contractor finishes up the job. But without demonstrable post-petition harm, it would be improper to lift the stay as of this date.

Our refusal to immediately lift the stay does no harm to American States beyond that which has already been done, pre-petition. Further, our Order of March 23, 1983, vests American States with the power of the purse during the remaining life, however short, of this project; a more powerful form of "adequate protection" would be hard to envision than the surety's continuing veto power over all disbursements by the Chapter 11 trustee.

In summary, we must balance the proof offered by these parties. Glover testified that the Fort Knox job can be closed out at a profit, although the projected margin is so

slight as to be almost meaningless.[5] On the other hand, American States has supplied us with no firm contradictory projection that the cost of completion *from the date of the hearings forward* will exceed the funds available.

We are further necessarily influenced by the absence of any proof from American States as to how, if at all, the surety would be able to minimize its losses and make the job more cost-efficient if it were permitted to escape the § 362 stay and take over the project. The witness from the Army Corps of Engineers had received no clear indication of American States' intentions, and the fear was expressed that the job would simply be weather-proofed against the coming winter season with no further activity on the site until spring. If that indeed is the surety's intention,—and this is pure speculation—then no good would come to anyone, American States included, of shutting down the work now, other than to extract retributive justice from Glover for the past liabilities he has obviously caused the surety to incur.[6]

Finally and most importantly, we will with this order give true meaning to Glover's own best estimate that the job can be completed within cost *only if* completed by December 31, 1983. If work is still in progress after that date, with all contract funds spent, with new subcontractor claims being incurred upon which American States would become liable, and with the per-diem liquidated-damage provision operating, the loss to the surety would be immediate and profound. Unless Glover could on December 31 provide "adequate protection" of some form and character presently beyond our power to envision, American States would then be entitled, based upon the evidence of record as of this writing, to an unconditional lift of the stay.

Having thus predicted, if not required, the renewal by American States of its § 362 motion, we must obviously characterize this order as an interlocutory one. At such future hearing as the parties may by their pleadings precipitate, the burden will be upon Glover to show cause why the automatic stay should not be lifted with finality, effective December 31, 1983.

---

5. Glover projects a profit of roughly $131,000 on a $6.3 million contract, or a profit margin of about two per cent.

6. In this connection, particularly, we weigh into the balance the interests of the financially vulnerable subcontractors at work on the Fort Knox job.