FIRST NATIONAL INSURANCE COMPANY OF AMERICA vs.
COMMONWEALTH.

Suffolk. September 14, 1983. — March 1, 1984.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

Contract, Commonwealth, Termination. Commonwealth, Contract.
Surety.

The Commonwealth, on being notified by the surety on a public building
contract that the contractor was in default for failure to pay its sub-
contractors and suppliers, was not, in the circumstances, obliged to
protect the surety's potential subrogation rights in the contract funds
by stopping payment on a check issued to the contractor for a progress
payment to which it was entitled under the contract. [325-327]

CIVIL ACTION commenced in the Superior Court on July
19, 1976.

The case was heard by Lynch, J.

The Supreme Judicial Court granted a request for direct
appellate review.

Alexander H. Pratt, Jr., for the plaintiff.

Richard E. Rafferty, Assistant Attorney General, for the
Commonwealth.

O'CONNOR, J. First National Insurance Company of
America (Surety), surety on performance and payment
bonds for a public building contract, seeks to recover from
the Commonwealth the value of a progress payment made .
by the Commonwealth to the contractor. The Surety, who
completed performance on the contract after the
contractor's default, alleges that the Commonwealth's
failure to stop payment on the progress payment check
violated the Surety's subrogation rights to the contract.
funds. Following a jury-waived trial, the judge held that

the Commonwealth was entitled to issue the progress payment check and was not required to stop payment on it. The plaintiff appealed and we granted its application for direct appellate review. We now affirm the trial judge's decision.[1]

The parties do not challenge the judge's findings, which we summarize. On or about April 30, 1973, following a public bidding process, the Commonwealth, through its Bureau of Building Construction (Bureau), entered into a contract with Allied Heating Co., Inc. (Allied), for the construction of additions to the steam distribution system of the University of Massachusetts, Amherst campus. Pursuant to the provisions of G. L. c. 149, §§ 29 and 44A-44L, as in effect in 1973, the Bureau obtained from the Surety statutory performance and payment bonds naming Allied as principal and the Commonwealth as obligee in connection with the contract.

The contract contained detailed provisions regulating progress payments to be made to Allied. On September 9, 1974, Allied submitted to the Bureau a requisition for the eleventh progress payment in the amount of $38,405.55. The architect, the clerk of the works, the Bureau's construction engineer and the Bureau's acting chief construction engineer all approved this progress payment.

On September 30, 1974, the Surety sent a mailgram to the Bureau stating that Allied was in default for failure to pay subcontractors and suppliers. The mailgram requested that the Commonwealth make no further payments to Allied without the Surety's consent. The Bureau received this mailgram on or about October 2. On October 3, the Surety sent a confirmatory letter to the Bureau and to Allied. That letter was received by the Bureau on or about October 9. It stated that the Surety was investigating the situation and repeated the request that the Bureau make no further payments to Allied without the Surety's written consent.

---

[1] This is the second time that this case has come before us. In *First Nat'l Ins. Co.* v. *Commonwealth*, 376 Mass. 248 (1978), we held that the complaint was sufficient to state a cause of action under the then-existing G. L. c. 258, § 1.

On October 3, 1974, the Commonwealth issued a check in the amount of $38,405.55, payable to Allied, as progress payment number 11. Allied deposited the check in its bank account. The check was not paid by the drawee bank until October 23, 1974. At no time did Allied use the proceeds of the check to pay subcontractors or materialmen. That check is the subject of the present controversy.

On October 15, 1974, the Bureau wrote to the Surety acknowledging receipt of the Surety's mailgram dated September 30, and of its letter dated October 3. The Bureau also urged the Surety to expedite its investigation of Allied for the stated reason that the work being performed was vital to the University of Massachusetts.

On October 16, 1974, representatives of the Surety and of the Bureau met at the Bureau to discuss the status of the project. The Surety announced that it intended to take over the performance of the contract, stating that Allied had admitted in a letter to the Surety (not produced at the meeting) that Allied could not perform any further work. The Bureau stated that it would require a letter from Allied manifesting Allied's intentions, and, in particular, its concurrence in the intervention of the Surety. The Surety agreed to arrange this, and advised the Bureau that the Surety's construction consultant would review the job and that bids would be solicited for completion of the work. It was stated that the Surety expected to be paid the balance of the contract price for completing the contract, and the Bureau expressed no objection to this.

At the meeting, the Surety asked for information concerning the balance of the funds remaining in the account. Relying on the Bureau's records, which reflected the deduction of funds from the account up to and including progress payment number 11, the Bureau represented that the contract balance outstanding was $140,664.42.[2] No mention was made of the recently issued check for $38,405.55 or progress

_____

[2] This figure resulted from subtracting $498,335.58, the accumulated total paid to Allied (including progress payment number 11), from the total contract price of $639,000.

payment number 11. The Surety did not request that the Bureau inquire to see if any recent payments had been made to Allied. There was no mention of stopping payment on any check. Specific questions relative to progress payment number 11 did not arise until a year or so later in late 1975 or early 1976.

Allied continued to perform the contract until October 16, 1974. On October 17, Allied removed its equipment and manpower from the site, indicating to the Bureau that no further work would be done. The Bureau's project engineer, who had met with the Surety's representatives at the meeting the day before, was advised of the situation. There was no further activity on the job during the following week.

On November 8, 1974, the Bureau sent a notice letter, as provided in the contract, requesting Allied to increase its work force and man the job. Allied did not respond, and on November 21, the Bureau notified Allied that it had been terminated. On the same day, the Bureau directed the Surety to complete the contract in accordance with the terms of the performance bond. Thereafter, commencing in February, 1975, ten progress payment requisitions were submitted by the Surety and paid by the Commonwealth.

The Surety paid the claims of subcontractors and suppliers and completed the work. The total payment by the Surety substantially exceeded the amount of the remaining contract balance paid to the Surety by the Commonwealth, resulting in a loss to the Surety, part of which it seeks to recover in this action.

We are guided by numerous Federal decisions which have applied the Federal performance and payment bond statute, the Miller Act, 40 U.S.C. § 270a (1976). We begin our analysis with a recognition of "the well-established principle that the subrogation right claimed by [the Surety] is not a right that springs from contract but is merely a creature of equity, to be carried out in the exercise of equitable discretion and with due regard to the legal and equitable rights of others." *Argonaut Ins. Co.* v. *United States,* 434 F.2d 1362, 1367 (Ct. Cl. 1970).

We note, too, that the considerations relevant to a determination of rights to progress payments which become due during the course of construction are significantly different from the considerations that are appropriate to a determination of rights to contract funds retained by the government after the construction has been terminated or completed. "During performance, the Government's role is substantially different from that of a mere stakeholder of a final contract payment. The [Government] has an important interest in the timely and efficient completion of the contract work. In furtherance of this interest, the Government contracts for a broad range of rights which are designed to promote continuation of the contract work. These provisions give the Government considerable discretion and flexibility in administering the contract. Public policy supports this flexibility in light of the various unforseen circumstances which may hinder performance. During the performance of the contract the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." *Id.* at 1367-1368. The court in *Argonaut Ins. Co.* v. *United States, supra,* held that the government's refusal to terminate the contract and its decision that the progress payment "was essential to the continued performance" of the contract and should be forwarded to the contractor without first obtaining the surety's consent, contrary to the surety's request, "were well within the range of discretion conferred on the contracting agency by the terms of the contract and the applicable regulations." *Id.* at 1369. Those principles, enunciated in *Argonaut Ins. Co.* v. *United States, supra,* have been applied in other cases in which courts have balanced the government's interest in making a progress payment to a contractor to keep the project going, with the surety's potential subrogation rights. See *United States Fidelity & Guar. Co.* v. *United States,* 676 F.2d 622, 628 (Ct. Cl. 1982); *United Bonding Ins. Co.* v. *Catalytic Constr. Co.,* 533 F.2d 469, 475 (9th Cir. 1976); *Royal Indem. Co.* v. *United States,* 529 F.2d

1312, 1319-1320 (Ct. Cl. 1976); *United States Fidelity & Guar. Co.* v. *United States*, 475 F.2d 1377, 1384 (Ct. Cl. 1973); *Fireman's Fund Ins. Co.* v. *United States*, 362 F. Supp. 842, 846 (D. Kan. 1973); *United States* v. *Continental Casualty Co.*, 346 F. Supp. 1239, 1243 (N.D. Ill. 1972).

In his memorandum of decision, the trial judge concluded: "Even where the Commonwealth knows, or should know, that a contractor has serious financial difficulties, the Commonwealth does not become obligated either to withhold progress payments or to declare the contractor in default at the surety's request — and no such request was made here by [the Surety] — so long as the progress of the contractor on the job is satisfactory to the Commonwealth and it has good reason to believe that the Contract will be completed." The Surety concedes that the judge accurately stated the law. Furthermore, the Surety agrees that the Commonwealth rightfully issued its check to Allied as progress payment number 11 on October 3, 1974. However, says the Surety, after the meeting of October 16, when the Surety declared its intention to take over the job, or at the latest, on October 17, when Allied abandoned the job, the Bureau "ceased to have any good reason to believe that Allied would complete the contract and, therefore, was required to accede to the Surety's request to withhold progress payments from Allied."

The Surety's contention assumes that the issuance of the check on October 3, 1974, was not a payment, and the Surety cites *Noble* v. *John Hancock Mut. Life Ins. Co.*, 7 Mass. App. Ct. 97, 99 (1979), for that proposition. In that case the Appeals Court held that "[a]bsent an agreement to the contrary, a waiver or an estoppel, the receipt of a check constitutes only an acceptance conditional upon the check's being honored when properly presented." *Id.* at 98. There is a distinction, however, between payment and acceptance of payment. Although an underlying debt may not be discharged unless payment is accepted, payment by check nonetheless is made when the check is "drawn on an account with sufficient funds to cover [it] at a solvent bank"

and is delivered to the payee.  *Terry* v. *Kemper Ins. Co.,* 390 Mass. 450, 455 (1983).  The question, therefore, is not whether the Commonwealth was obliged to "withhold" payment after October 16 or 17, but whether it was obliged to "withdraw" it by stopping payment on the check.  We are unaware of any case in which a court has gone so far as to hold that, whenever the government lacks good reason to believe that the contractor will complete the contract, the government has a duty to stop payment on a check that had been rightfully issued to a contractor as a progress payment. Equitable considerations do not require us to adopt such a rule, at least in the circumstances of this case, where prior to payment of the check the Surety neither inquired whether a payment had recently been made nor brought to the Bureau's attention the possibility of stopping payment on the check.

*Judgment affirmed.*